**WINN–DIXIE MONTGOMERY, INC.,**
Plaintiff-Appellant,

v.

**UNITED STATES of America,**
Defendant-Appellee.

No. 29859.

United States Court of Appeals,
Fifth Circuit.

June 17, 1971.

Neal C. Newell, Edward L. Hardin, Jr., Birmingham, Ala., J. Shepard Bryan, Jr., Jacksonville, Fla., Richard H. Hunt, Jr., Steven A. Schultz, Miami, Fla., Hare, Wynn, Newell & Newton, Birmingham, Ala., for appellant; Smathers & Thompson, Miami, Fla., of counsel.

Wayman G. Sherrer, U. S. Atty., E. Ray Acton, Asst. U. S. Atty., Birmingham, Ala., Johnnie M. Walters, Asst. Atty. Gen., William K. Hogan, Lee A. Jackson, Attys., Tax Div., U. S. Dept. of Justice, Washington, D. C., Joseph M. Howard, Crombie J. D. Garrett, Benjamin M. Parker, Attys., Tax Division, Dept. of Justice, Washington, D. C., for appellee.

Before WISDOM and GOLDBERG, Circuit Judges, and DAVIS,* Judge.

DAVIS, Judge.

Winn-Dixie Montgomery, Inc. is a wholly-owned subsidiary and one of eight marketing divisions (with its own warehousing and cold storage facilities) of Winn-Dixie Stores, Inc., a major food retailer in the southeastern United States.[1] On August 1, 1962 it acquired and took over a chain of retail grocery outlets which belonged to Hill Grocery Company, Inc. The latter was a family corporation owned and managed for half-a-century by two brothers, James and Nelson Hill. It operated 35 supermarkets in Birmingham and other North Alabama communities, controlling 28 or 29 per cent of the grocery market in the Birmingham area. The agreement between Winn-Dixie and Hill provided for the purchase price of "all properties, assets and rights" acquired by the buyer to be the net book value of those "properties, assets and rights" computed as of the close of business on July 28, 1962,

---

* Honorable Oscar S. Davis, U. S. Court of Claims, Washington, D. C., sitting by designation.

1. Both appellant and its parent will be referred to as Winn-Dixie.

"and Four Million Four Hundred Twenty Thousand Dollars ($4,420,000)."

The tax dispute before us centers on what that "premium" of $4,420,000 should be deemed to have bought. Winn-Dixie filed its income tax returns for fiscal years 1963 and 1964 on the assumption that this sum represented acquisition costs of leaseholds purchased from Hill, and accordingly amortized those costs over the ascertainable lives of the leases. The Internal Revenue Service disallowed these amortization deductions on the ground that none of the "premium" of $4,420,000 was apportionable to the leases; deficiencies of $390,000 and $422,500 were assessed and collected for the two years. In this refund suit, Winn-Dixie would now allocate $3,375,000 to the leaseholds and the rest of the $4,420,000 to certain tangible assets.[2] The Government maintains, consistently with the Service, that the entire sum should be treated as having been paid for goodwill or other non-amortizable intangibles. The District Court, sitting without a jury, upheld the latter contention, 307 F.Supp. 1304.

1. The purchase-and-sale agreement makes no allocation of the $4,420,000 figure to any asset, tangible or intangible, and the record is indisputable that Winn-Dixie and Hill did not make any such apportionment during their discussions. The "premium" was simply bargained for as a lump sum. In all probability, this mode of negotiation, which obviously entails certain risks for the signatories, was deliberately followed by mutual understanding, so that neither side would be definitively precluded by the wording of the pact from urging its most advantageous tax position to the revenue officials. The result is that the courts must solve the tax problems as best they can, without express guidance from the mutual agreement of the contracting parties, on the basis of the document's test and context, as well as of the testimonial and other evidence presented at the trial.

2. In that inquiry the first matter to appraise—since appellant insists that it bought no goodwill at all and did not acquire the smaller chain as a going business but only some of its specific assets —is what type of property was actually transferred. Under the agreement, Hill sold Winn-Dixie "all of the seller's then existing assets and *business as a going concern,* including properties, assets and rights relating to the *operation of its thirty-five (35) retail stores* but specifically excluding all of Seller's warehouse operations in Birmingham, Alabama." (emphasis supplied) The detailed items mentioned as transferred[3] form a rath-

---

2. In its returns, its refund claim, and its pleadings below, appellant claimed the entire premium as leasehold acquisition cost. However, in this court it attributes these actions to a "bookkeeping error," and contends that it proved below that $3,375,000 was allocable to the leases and the remainder of the premium ($1,045,000) was paid for equipment, inventory, and supplies which collectively had a fair market value in excess of book value by that amount. While a taxpayer seeking a refund must prove his entitlement to recovery on the ground asserted to the Commissioner, Carmack v. Scofield, 201 F.2d 360 (C.A. 5, 1953), proof that he should recover a lesser amount than that asserted to the Service is not fatal. Red River Lumber Co. v. United States, 139 F.Supp. 148, 134 Ct.Cl. 444 (1956) ; *cf.* Cohan v. Commissioner of Internal Revenue, 39 F.2d 540, 543–544 (C.A. 2, 1930).

Therefore, since no showing of bad faith has been made, Pancoast Hotel Co. v. Comm'r, 2 T.C. 362, 368 (1943), *acq.* 1943 Cum.Bull. 18, we consider appellant's modified position.

3. Included in the agreement among the "properties, assets and rights" transferred were:

A. All stock in trade, supplies and merchandise inventories located in the 35 stores and in the seller's warehouses used for regular servicing of its Birmingham stores.

B. All motor vehicles, including automobiles, trucks, trailers and tractors ; and all motor vehicle supplies and parts.

C. All furniture, fixtures, and equipment used in the stores and all other furniture and equipment owned by the seller.

er comprehensive schedule of the things needed for a successful retail grocery operation. To be sure, a few assets were not acquired, notably Hill's Birmingham warehouse facilities, but we do not think any of the excluded items impaired the "going concern" nature of the business taken over. The Birmingham warehouse was left out because, as appellant admits, Winn-Dixie's Montgomery warehouse was more than adequate for its operations in that area, which includes Birmingham. A prime impetus for the acquisition had been Winn-Dixie's desire to gain additional retail outlets in the Northern Alabama region in order to improve the efficiency of its warehousing operation there. The Montgomery warehouse was fully capable of supplying all the retail stores acquired from Hill, and was used to service them after the take-over. Among the other excluded assets were the "Continental Gin property", on which Hill had planned to construct a new warehouse, and $2,000,000 in cash which Hill had accumulated to build the warehouse. Winn-Dixie did not need the Continental Gin property, and it concedes that it had sufficient cash to substitute for the money retained by Hill. Significantly, Winn-Dixie did get the change funds customarily carried at the Hill stores, which amounted to about $57,000.

It is also revealing that appellant took over Hill's employees; it agreed "to retain at substantially their present compensation all Seller's retail store and market personnel." It also committed itself to give the retained employees credit for their past full-time employment by the seller, and to assume liability for accrued vacation pay for all of these employees except warehouse and delivery workers. In return Hill undertook not to increase compensation to any of its employees before the transfer, and to furnish Winn-Dixie with a list of those who were earning $7,500 or more annually. There are still further indications in the agreement that a going business, and not merely a collection of assets, was being transferred. Hill was required to warrant that "since December 31, 1961 there has not been * * * any event or condition of any character materially and adversely affecting the Seller's business or prospects * * * ". The seller also agreed that it would not enter into "any contract or commitment relating to the retail food business being purchased by Buyer."

The implementation of the purchase-and-sale agreement followed in the same channel. Winn-Dixie took over the Hill stores at the close of business on Saturday, July 28, 1962, and they opened the following Monday morning, July 30. There was no interruption, and appellant stepped right into the shoes of its predecessor, using Hill's supplies and change-funds, and selling its inventory until depleted. The record is overwhelming, in a word, that, under the terms of the agreement and in the contemplation of both its parties, Hill transferred a going concern to Winn-Dixie.

■ 3. Nevertheless, appellant argues that it did not purchase or pay for any goodwill. We are told that Hill had no goodwill to sell because "goodwill, as such, does not exist in the retail food chain industry." In support of this rather startling proposition, taxpayer

---

D. All leasehold improvements located in or at the stores and certain parking lot improvements owned by seller.

E. All prepaid property taxes, vehicle and municipal licenses and license fees and other deposits and prepaid items relating to the retail stores.

F. All the leases on which seller was lessee.

G. All rights to the name of the seller.

H. All change funds carried at the retail stores.

I. All of the real property owned by seller and the buildings and other structures thereon.

K. All other assets and rights of the seller, whether real, personal or mixed and wherever situated, including all trademarks and brand names, if any, owned by the seller, except those rights and assets specifically excluded.

offered an expert witness who testified that (1) retail food store shoppers are not loyal customers, (2) the location of a grocery store, in terms of convenience to the shopper's home, is the most important factor in determining patronage, and (3) the "name" of the store is unimportant to the shopper. We think that taxpayer's reliance on this testimony misconceives the nature of goodwill, which is the expectancy that "the old customers will resort to the old place." Commissioner of Internal Revenue v. Killian, 314 F.2d 852, 855 (C.A.5, 1963); Nelson Weaver Realty Co. v. Commissioner of Internal Revenue, 307 F.2d 897, 901 (C.A.5, 1962); Karan v. Commissioner of Internal Revenue, 319 F.2d 303, 306 (C.A.7, 1963). "[T]he essence of goodwill is the expectancy of continued patronage, for whatever reason." Boe v. Commissioner of Internal Revenue, 307 F.2d 339, 343 (C.A.9, 1962). It is clear that Hill possessed a great expectancy of continued patronage in 1962, and that it therefore had substantial goodwill. The Hill brothers had operated the chain for fifty years and enjoyed a major portion of the Northern Alabama retail grocery market and an unusually high earnings record.[4] Like another retail food concern in a comparable situation, Hill possessed goodwill by virtue of the "most successful retail food marketing operations in that vicinity." Montesi v. Commissioner of Internal Revenue, 340 F.2d 97, 99 (C.A.6 1965). Location may indeed be a key element in retail food store patronage, but to the extent location contributes to the expectancy that the old customers will resort to the old place it is an element of goodwill. Commissioner of Internal Revenue v. Seaboard Finance Co., 367 F.2d 646, 651 n. 6 (C.A.9, 1966); Boe v. Commissioner of Internal Revenue, *supra*, 307 F.2d at 343.

All the elements which gave Hill this considerable goodwill were passed to appellant. As we have noted, Winn-Dixie

purchased the business as a going concern and immediately assumed operation of all thirty-five stores. It agreed to "retain at substantially their present compensation all Seller's retail store and market personnel." See Barran v. Commissioner of Internal Revenue, 334 F.2d 58, 61 (C.A.5, 1964). It acquired "all rights to the name of Seller and/or trade name 'Hill's' or 'Hill Food Stores'."

Winn-Dixie's assertion that these names had no value is squarely contradicted by its own actions. After it got possession of the chain it advertised the stores as "Hill-Winn-Dixie" stores from July 30, 1962 to some time in 1968, and it retained the Hill signs at the stores without change. Moreover, in 1963 or 1964 when Winn-Dixie obtained another chain, the Colonial Stores of Birmingham, it placed the Hill name on them. These deliberate choices prove that Winn-Dixie must have considered the Hill name and aura to be valuable. The sales agreement forecast that this would be so since the seller promised to use its best efforts, before transfer, to carry on the retail grocery business and "to promote its affairs and earning capacity." After the closing, the Hills were given seats on Winn-Dixie's Board of Directors, and they agreed not to compete in the grocery business with the latter.

This Court has held that, in circumstances like these, goodwill is acquired by the purchaser of a going concern where the "transfer enables the purchaser to step into the shoes of the seller." Balthrope v. Commissioner of Internal Revenue, 356 F.2d 28, 32 n. 1 (1966); Masquelette's Estate v. Commissioner of Internal Revenue, 239 F.2d 322, 325 (1956). We have also said that goodwill is transferred where, as here, the buyer continues the seller's business uninterrupted, using primarily the seller's employees, and utilizing the seller's name. Barran v. Commissioner of Internal Revenue, *supra*, 334 F.2d 58, 61 (1964). It is immaterial that the agree-

---

4. In the three years prior to the acquisition (1959, 1960, and 1961) Hill Grocery Company had average annual sales of $38,425,000, and average annual net profits (before federal and state taxes) of $1,264,000.

ment did not use the term "goodwill," for "[t]he use of these words is, of course, not necessary if in fact what is transferred does give to the purchaser everything that can effectively aid him to step into the shoes of the seller." Masquelette's Estate v. Commissioner of Internal Revenue, *supra*, at 325; see also Barran v. Commissioner of Internal Revenue, *supra*, at 61. To the same effect are Pfleghar Hardware Specialty Co. v. Blair, 30 F.2d 614, 617 (C.A.2, 1929); Speed Products Co. v. Tinnerman Products, Inc., 179 F.2d 778, 782 (C.A.2, 1949). On the basis of the objective evidence and indications, we would have to conclude, as the District Judge did, that Winn-Dixie purchased substantial goodwill as part of the Hill grocery business.

4. Appellant seems to urge that all these objective factors are inevitably outweighed, as a matter of law, by its unilateral, subjective, uncommunicated evaluation, before the sale, that it would pay nothing for goodwill—that the "premium" of $4,420,000 would be composed of $3,375,000 for the extra value of the leaseholds taken over from Hill and $1,-045,000 for the excess worth of certain tangible assets over their book value (see note 2, *supra*). According to its testimony, Winn-Dixie arrived at the $3,375,000 figure by the following route: During the negotiations it requested and received detailed information as to Hill's "occupancy cost"[5] for each retail outlet. The Winn-Dixie official who represented it in dealing with the Hills determined that 1.8 per cent of annual sales was Winn-Dixie's average occupancy cost for new locations. He then computed 1.8% of each Hill store's annualized sales, and compared that figure with Hills' current occupancy costs. If those expenses exceeded 1.8% of sales, negative values were attached. In those stores where the 1.8% figure ex-ceeded current occupancy costs, positive values were given. This bonus or negative value was multiplied by the number of years remaining on the existing leases, and the products totalled.[6] These computations produced a total net "premium value" for the leases of $3,-374,634, which was rounded off to $3,-375,000. Appellant says that this figure became the basis of its offer and was paid to acquire the leaseholds. The rest of the "premium" of $4,420,000 went, in appellant's eyes, for the excess over book value of certain equipment, inventory and supplies.

■ We can accept this evidence (as indicating what Winn-Dixie intended) without agreeing that, by itself, it automatically requires taxpayer to prevail as a matter of law. As we have pointed out, the sales agreement provided a lump-sum purchase price of net book value plus $4,420,000. No allocation of this price was made nor was any distribution discussed during the negotiations. There was likewise no joint appraisal of the worth of the leaseholds. Winn-Dixie's evidence on this point consists solely of internal memoranda and statements made by and circulated among its own officials. This unilateral valuation of the leases was not communicated in any way to the Hills; it was purely "inside" information, held close to the chest. No decision holds or suggests that such a one-sided, uncommunicated apportionment of a sales price is conclusive on the taxing authorities, and it is obvious that it would be dangerous and unfair to lay down that categorical rule. The whole trend of the law in this area is against binding the Revenue Service by such a secret, unilateral, subjective allocation which is not carried over into the agreement. *Cf.* Commissioner of Internal Revenue v. Danielson, 378 F.2d 771 (C.A.3), cert. denied, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967); Commission-

---

5. Occupancy cost, in Winn-Dixie's computation, included rent, taxes, insurance (if the lessee's responsibility), and amortization of leasehold improvements and other capitalized costs.

6. Values were not assigned to stores without a lease or to locations with low volume.

er of Internal Revenue v. Seaboard Finance Co., *supra*, 367 F.2d 646, 652–653 (C.A.9, 1966); Balthrope v. Commissioner of Internal Revenue, *supra*, 356 F.2d 28, 31–32, 34 (C.A.5, 1966); Boe v. Commissioner of Internal Revenue, *supra*, 307 F.2d 339, 343 (C.A.9, 1962); Hamlin's Trust v. Commissioner of Internal Revenue, 209 F.2d 761, 765 (C.A. 10, 1954).[7]

■■ 5. The next and crucial issue is whether the District Court correctly found that the entire "premium" of $4,420,000 was paid for goodwill, or, more precisely, whether it was clearly erroneous on the record as a whole for the trier of fact to accept the Commissioner's determination that none of this sum was paid for extra value of the leaseholds or other amortizable assets.[8] Of course, the Service determination of a deficiency is presumptively correct, and the burden is on the taxpayer to establish the existence and amount of an overpayment. David v. Phinney, 350 F. 2d 371 (C.A.5, 1965), cert. denied, 382 U.S. 983, 86 S.Ct. 560, 15 L.Ed.2d 473 (1966); Compton v. United States, 334 F.2d 212, 216 (C.A.4, 1964); Carter v. Campbell, 264 F.2d 930, 937 (C.A.5, 1959); United States v. Harris, 216 F.

2d 690, 691 (C.A.5, 1954). There are two aspects to the question of whether the presumption has been overborne in this case—first, did appellant show that its leaseholds had any excess value, and, conversely, did the trier err in finding that all of the "premium" was paid for goodwill (or a comparable non-amortizable asset).[9]

*Leaseholds:* For its proof that the leases had about $3,375,000 of extra value, Winn-Dixie has relied almost entirely on its internal pre-agreement evaluation which we have already held cannot be considered conclusive by itself. Perhaps in some situations such evidence of unilateral allocation could be weighed, along with other factors, in reaching a conclusion that an asset was purchased for the privately allocated amount, see American Fork & Hoe, Inc., 2 CCH Tax Ct.Mem. 842 (1943), but it is important to recognize that all that Winn-Dixie proved directly was that its officials appraised the leases at $3,375,000 over the designated rent. As appellant recognizes, the basis for amortization deductions is not value but cost, Internal Revenue Code of 1954 §§ 167(g), 1011, 1012; cost is what the buyer paid for the asset, not what the buyer thought it was

---

7. Appellant's argument, citing Republic Steel Corp. v. United States, 40 F.Supp. 1017, 94 Ct.Cl. 476 (1941), that even if goodwill was transferred, Winn-Dixie failed to recognize or pay for it, thereby giving the goodwill a cost basis of zero, does not fit the present case. In *Republic Steel* the parties agreed that the only intangible asset being acquired which had any value was certain patents, and that goodwill had no existence apart from those patents; the court in those circumstances accepted the parties' view of the transaction. 40 F.Supp. at 1023, 94 Ct.Cl. at 489. Here, there is no evidence that the seller valued its goodwill at zero, and since the agreement indicates that goodwill was transferred, we must decide how much Winn-Dixie paid for it.

8. Appellant concedes, as it must, that any portion of the "premium" held to be paid for goodwill is non-amortizable, since goodwill is an intangible capital asset which has no ascertainable useful life. Treas.Reg. 1.167(a)–3 (1954 Code);

Balthrope v. Commissioner of Internal Revenue, 356 F.2d 28, 31 (C.A. 5, 1966); Commissioner of Internal Revenue v. Killian, 314 F.2d 852, 855 (C.A. 5, 1963); Boe v. Commissioner of Internal Revenue, 307 F.2d 339, 343 (C.A. 9, 1962); Dodge Brothers v. United States, 118 F.2d 95, 100 (C.A. 4, 1941).

9. Taxpayer reads the District Court's conclusions of law as requiring it to prove that the entire "premium" was paid for the leases in order to entitle it to any recovery. We do not so understand that portion of the conclusions, which seems, rather, to say that taxpayer cannot now claim that it paid the "premium" for things other than excess value of the leases (*i. e.*, raise a new ground other than the basis given in its refund claim). In any event, appellant was able to introduce whatever evidence it deemed relevant, and, for the reasons given in the text, *infra*, the trial court properly found that Winn-Dixie did not prove that it paid anything at all for the leases.

worth. The District Court was not compelled to jump this gap, unbridged by supporting evidence, and in view of the Government's opposing testimony it refused to do so. The court found that "the leasehold interests acquired by Winn-Dixie from Hill Grocery Company, Inc. had no significant value in excess of the fair rental value of the premises. Any value attributable to the leases was of a nominal nature." While this finding may not be as semantically elegant as appellant wishes,[10] we think it fairly states the conclusion that the transferred leases had no substantial value in excess of the rents being paid under them, and that Winn-Dixie did not pay any allocatable part of the $4,420,000 for them.

There is more than adequate support for this determination in the testimony of Ronald Ridgway, a government expert, and of Nelson Hill, one of the two Hill brothers.[11] Taxpayer objects to the substance of Mr. Ridgway's evidence, but all its arguments were raised below in extensive cross-examination, and go to the weight to be given the testimony, which was for the judge to decide as trier. United States v. Moreno, 182 F. 2d 258, 259 (C.A.5, 1950). We could not possibly say that the District Court was clearly wrong in electing to rely on the

views of Messrs. Ridgway and Hill over Winn-Dixie's pre-agreement, uncommunicated, self-serving evaluation of the leases.

It is said, however, that the finding as to the lack of value in the leaseholds cannot stand because the judge relied on a written report prepared by Mr. Ridgway which was identified at the trial but never introduced into evidence. We are not at all clear that the court below did make erroneous use of this written report. The only indication it may have done so is a footnote appended to the finding on the leases (quoted above), saying simply "Report prepared by Ronald W. Ridgway." Since this entire finding is expressly prefaced by a reference to the court's consideration of Mr. Ridgway's "expert testimony", it may be that all the unexplained footnote meant to convey was that the substance of this oral testimony, on which the judge relied, was also embodied in a written report. Be that as it may, we have compared the oral testimony with the report and conclude that, while the written document contains greater detail than the oral presentation, there are no significant or material points in the report which were not testified to in open court. If the judge did utilize the report incorrectly, his error was harmless

10. Appellant says that "fair rental value" is meaningless in the context, and the correct term which should have been used is "contract rent," but it seems plain that the court meant that the leaseholds had no significant value in excess of the contract rent which was (the court found) the fair rental value.

11. Mr. Ridgway testified that he performed an evaluation survey of the thirty-two leasehold interests obtained by Winn-Dixie from Hill (three of the stores were purchased in fee), and concluded that there were positive leasehold values of $212,000 and negative leasehold values of $270,000, for a net aggregate value of minus $58,000. He stated that he reached this figure by assigning a value to each leasehold by comparing the contract rent (the rent under the lease) and the economic or fair market value rent (the amount obtainable in the real estate market). The economic rent in the Northern

Alabama area was about 1% of sales, with a protective minimum rental of $1.25 to 1.35 a square foot, which he based on statistical compilations, such as the National Association of Real Estate Brokers' volume "Percentage Leases, The Basis of Equality Between Lessors and Lessees", and on field investigation and interviews. The differential, calculated by comparing the contract and economic rents, was then capitalized based on the remaining term of the lease.

Mr. Nelson Hill, an owner and principal officer of Hill Grocery Company, testified that the leases assigned to Winn-Dixie were at the approximate rate of 1% of the store's sales which was a fair rental rate in the Birmingham area in 1962. Mr. Hill also said that Winn-Dixie received no bargain rentals or special treatment because of the purchase transaction; the leases could have been obtained at the same rates by any other prospective tenant.

and did not affect the findings or the result.

Appellant also makes a special attack on the District Court's treatment of the leaseholds on the ground that it failed to appreciate the role of Hill Realty Company in the transaction. Hill Realty was a separate Hill family corporation; sixteen of the thirty-five stores operated by Hill Grocery were leased from Hill Realty. In the purchase agreement, Winn-Dixie undertook to lease thirteen of these sixteen from Hill Realty for terms of fifteen years with a rental of one per cent of gross sales, and a minimum annual rental for each store. The other three stores were leased on a month-to-month basis. The contention here is that the judge ignored the claim that a substantial portion of the "premium" of over four million dollars paid to Hill Grocery was to induce it to have its affiliate Hill Realty enter into the fifteen-year leases at the "bargain rate" of one per cent. There is no reason to think the judge ignored this argument. He must have rejected it, on good grounds, when he found that all the acquired leases in aggregate had no value in excess of their rentals. The evidence deals with all thirty-two acquired leases and supports the conclusions that the leases collectively had no fair market value in excess of their rentals, and that the one per cent was not a bargain rate. See note 11, *supra*.

■ *Goodwill*: Coordinate with its rejection of excess value for the leases was the District Court's finding that the Hill assets purchased by Winn-Dixie "included intangibles in the nature of goodwill or going concern value which were worth in excess of $4,300,000." Taxpayer charges that this impermissibly lumps goodwill and going concern value. While going concern value may be technically distinct from goodwill,[12] no great violence is done by using the terms together or generically, as is often done. See Barran v. Commissioner of Internal Revenue, *supra*, 334 F.2d 58, 61 (C.A.5, 1964); Masquelette's Estate v. Commissioner of Internal Revenue, *supra*, 239 F.2d 322, 325–326 (C.A.5, 1956); Sawilowsky v. Brown, 288 F. 533–537 (C.A.5, 1923). In any case, the judge's combination of the concepts caused no harm to appellant, since going concern value is also non-amortizable. Cornish v. United States, 348 F.2d 175, 185 (C.A.9, 1965).

Winn-Dixie also objects on the ground that the District Court again relied on materials outside the record, written reports by Mr. Ridgway and Dr. Albert Clark on goodwill, which, while identified, were never introduced into evidence. The situation is exactly the same as with Mr. Ridgway's report on the value of the leaseholds (which we have already discussed, *supra*)—the same type of cryptic reference to the reports is footnoted to the finding—and our reaction is the same:—it is uncertain that the judge used the written reports incorrectly and, if he did, the error was harmless since the Ridgway and Clark testimony went into considerable detail and covered the same main points as the written narrative.[13] Taxpayer carps at

---

12. Going concern value, strictly speaking, is bottomed on the ability of the acquired business to generate sales without any interruption because of the take-over. See United States Industrial Alcohol Co. v. Helvering, 137 F.2d 511, 513 (C.A. 2, 1943).

13. Ridgway testified that the goodwill and other intangibles acquired from Hill by Winn-Dixie had a value of $4,425,000. He stated that this figure was based primarily on the price-earnings method, and he described his calculation as follows: Using Moody's Industrial Manual he computed the mean price-earnings ratio of supermarket chains, which came to 17.5. He then multiplied Hill's 1958–1962 earnings (the 1958–1961 figures were based on Hill's profit and loss statements for those years; the 1962 figure was an annualized projection based on seven months operating results) by this ratio and thereby computed the total value of the Hill Grocery business. From this amount he subtracted the value of the assets not transferred, and the estimated value of the tangible assets, which left a value for intangibles of $4,426,000. He also testified that he calculated good-

much of the substance of this expert testimony, but in the net there is nothing of sufficient moment to deny the court below the trier's right to choose the Government's detailed evidence on the value of the transferred goodwill in preference to appellant's adamant but unrealistic thesis that no smidgeon of goodwill was acquired. If the goodwill was worth less than $4,420,000, taxpayer wholly failed to prove the figure.[14]

6. One further contention merits some discussion—that the court below erroneously applied the "mass asset" or "indivisible asset" rule. That principle usually controls where the buyer of a going concern attempts to allocate part of the purchase price to a group of intangible assets which he claims are exhausted over a period of time and are therefore depreciable. Under the rule, the intangible assets are treated as a single entity which, unlike its individual components, is considered to have no determinate useful life and is nondepreciable. See, *e. g.*, Thrifti Check Service Corporation v. Commissioner of Internal Revenue, 287 F.2d 1 (C.A.2, 1961); United States Industrial Alcohol Co. v. Helvering, 137 F.2d 511 (C.A.2, 1943); Golden State Towel & Linen Service, Ltd. v. United States, 373 F.2d 938, 179 Ct.Cl. 300 (1967). Our previous discussion demonstrates that the District Court's judgment is sustainable without any invocation of this rule; it is in no sense a necessary buttress of the result below, and as we read the court's opinion it gave the rule no more than alternative consideration. Moreover, whatever reliance the trial judge may have placed, in supplement of his main holding, on the rationale of the rule was not improper in the circumstances. As the Ninth Circuit has stated: "The rationale and purpose of the 'indivisible asset' rule is to prevent taxpayers from increasing the value of depreciable property to offset the amount paid in excess of book value of assets purchased. This doctrine makes it possible to strike down depreciation deductions for amounts which should properly be allocated to goodwill." Commissioner of Internal Revenue v. Seaboard Finance Co., *supra*, 367 F.2d 646, at 652 (1966). That purpose is served by the result reached here where the purchase agreement made no allocation at all of the "premium", yet at the same time indicated unmistakably that substantial goodwill was being transferred. See Boe v. Commissioner of Internal Revenue, *supra*, 307 F.2d 339, 342–343 (C.A.9, 1962); Commissioner of Internal Revenue v. Seaboard Finance Co., *supra*, 367 F.2d at 652–653. There was insufficient proof that any part of the "premium" was paid for the leaseholds, or any of them, while there was adequate evidence that the acquired

will by the ARM 34 method, which produced a figure of $3,500,000, and by the price book value method, which resulted in a value of $5,800,000. Ridgway chose the $4,425,000 amount based on the price earnings method as the most accurate.

Dr. Albert Clark testified that he had performed an appraisal of the Hill Grocery Company, and that he valued its goodwill as of January 1, 1962 at $5,293,280. This amount was based on the ARM 34 method, and he described his calculation thus: From the value in 1961 of the total assets of the company he subtracted the value of its non-productive and excess property, those assets not used in the retail grocery business, which left the net tangible operating assets of the company. He then used a capitalization rate of 4.7% which was the supermarket industry's average return on total assets, to calculate what Hill's "normal earnings" would be. Hill's average annual earnings for the 1958–1961 period were in excess of the normal earnings figure, so Dr. Clark capitalized that "excess" at a rate of 6.25% (corresponding to a price-earnings ratio of 16) which produced his valuation of goodwill.

14. The District Court's valuation of goodwill did not rest solely on the presumption favoring the Commissioner's determination but on affirmative evidence adduced by the Government. Appellant can therefore draw no support from Fulton Container Co. v. United States, 355 F.2d 319 (C.A. 9, 1966).

goodwill was worth at least as much as the "premium". In this situation there is justification in treating the entire "premium" as allocable, as a whole, to non-amortizable intangibles. *Cf.* Violet Newton, 12 T.C. 204 (1949).

The judgment is

Affirmed.