FIRST CHICAGO CORPORATION AND AFFILIATED CORPORATIONS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
First Chicago Corp. v. Commissioner
Docket No. 31175-88
United States Tax Court
T.C. Memo 1994-300; 1994 Tax Ct. Memo LEXIS 301; 67 T.C.M. (CCH) 3150; June 28, 1994, Filed *301 For petitioner: John L. Snyder, Michael M. Conway, Marilyn D. Franson, and Paul S. Caselton. For respondent: Lawrence C. Letkewicz, Dana E. Hundrieser, William G. Merkle, and James S. Stanis. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, by means of a statutory notice of deficiency, determined Federal income tax deficiencies for petitioner's 1984 and 1985 taxable years in the amounts of $ 2,371,664 and $ 21,828,460, respectively. On March 11, 1992, the Court ordered separate trials for the domestic and foreign issues. After concessions, the only remaining domestic issue for our consideration is the amount, if any, of the amortization deduction petitioner is entitled to with respect to the core deposit intangible acquired in the purchase of another bank. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation of facts and attached exhibits are incorporated by this reference. When the petition was filed, petitioner's principal place of business was Chicago, Illinois. Background -- Petitioner is a bank holding company engaged in the commercial and consumer banking business. Petitioner's primary subsidiary is The *302 First National Bank of Chicago (First National), which is a leading provider of consumer banking services to large corporate clients in the Chicago banking market. Prior to May 1, 1984, the American National Corp. (ANC) was wholly owned by Walter E. Heller International Corp. (Heller). ANC is a bank holding company with its offices in Chicago, Illinois. As of May 1, 1984, ANC owned the following percentages of the issued and outstanding stock in the following banks: Ownership
Bank
Interest (%)
American National Bank and Trust
Co. of Chicago
100
First National Bank of Libertyville
100
First American Bank of Bensenville
100
First Arlington National Bank
89.7
Elgin National Bank
80
The subsidiary, American National Bank and Trust Co. of Chicago (ANB), was a successful operating bank whose commercial banking business focused upon the Chicago middle market. For banking purposes, the middle market is composed of small and mid-sized companies with sales ranging from $ 5 million to $ 150 million. Middle market companies tended to rely on one bank for all their financial needs. ANB's franchise and reputation in the middle market was a valuable asset, and petitioner was *303 willing to pay a premium for that asset. At the time of the acquisition, petitioner enjoyed only a small share of the middle market and sought expansion into that market. Petitioner had attempted to build its middle market business share during the 1970s. Those efforts were not only unsuccessful, but had blemished petitioner's reputation in the banking community. The Transaction -- In 1982, Heller retained the investment banking firm of Salomon Brothers, Inc., to assist in the sale of ANB. Salomon Brothers, Inc., prepared an offering memorandum which was distributed to interested parties, including petitioner. Petitioner began to actively pursue the acquisition of ANB during 1982. In 1983, petitioner retained the investment banking firm of First Boston Corp. to advise about its attempt to acquire ANB. First Boston Corp. advised petitioner to pursue the acquisition because ANB had a good reputation and position in the Chicago business community. During 1982 and 1983, petitioner and Heller negotiated the purchase and sale of ANC, the holding company that owned ANB, and, by the middle of 1983, reached an agreement in principle for the acquisition of ANC. On March 28, 1983, *304 petitioner sought a preliminary review of its proposed acquisition by the Federal Reserve Bank of Chicago. On August 5, 1983, petitioner's Board of Directors approved the form, terms, and provisions of a Letter of Intent to purchase ANC. On August 9, 1983, petitioner and Heller executed the Letter of Intent providing for the purchase and sale of ANC for $ 275 million. On September 23, 1983, petitioner and Heller executed a definitive buy-sell agreement. Heller's Board of Directors unanimously approved the sale of ANC to petitioner based upon their determination that the transaction was fair and in the best interest of Heller's shareholders. On January 13, 1984, petitioner submitted a formal application to the Federal Reserve Bank of Chicago requesting approval to purchase ANC. The Federal Reserve Bank of Chicago approved the acquisition on March 23, 1984. Petitioner, on May 1, 1984, purchased all the issued and outstanding ANC stock from Heller for $ 273,721,181 in cash, the amount resulting after certain adjustments to the $ 275 million purchase price. At the time of purchase, petitioner's management thought that ANC was worth between $ 250 million to $ 275 million and that, *305 at the $ 275 million purchase price, ANC was fully priced. Petitioner made a valid section 338 [1] election with respect to the purchase of ANC. Petitioner determined that the fair market value of ANC's net tangible assets was $ 138,498,925. For financial, regulatory, and tax accounting purposes, petitioner assigned bases to other items, including $ 128,677,742 to the core deposit intangible and a basis of $ 3,003,514 to goodwill in connection with the purchase of ANC. As of May 1, 1984, the five ANC banks had composite deposit account balances as follows: Account
Balance
Savings
$ 123,828,736
Demand
1,066,500,565
NOW [2] *306 72,434,706
Super-NOW
610,316
Money-market
194,128,941
CD's
1,162,457,248
[3] 2,619,960,512
The parties have stipulated to the rate of attrition of the acquired deposits. See Appendix. ANB paid the following interest rates on the deposit accounts: Account
Rate(%)
12/31/81
12/31/82
12/31/83
3/84
Demand
0
0
0
0
Savings
5.25
5.25
5.25
5.5
NOW
N/A
N/A
5.25
5.5
Money-market
N/A
N/A
8.569
8.758
After the acquisition, petitioner operated ANB and First National separately. Petitioner's management made this decision *307 because ANB's trade name and reputation was valuable in the middle market and ANB served the market well. OPINION Initially respondent contended that the core deposit intangible is conceptually not amortizable. If unsuccessful on that issue, respondent then argued that the cost replacement method established the maximum value to be placed on core deposits. Following the trial and during the briefing period, the Supreme Court decided a case that had a profound effect upon questions involving amortization of intangibles. Newark Morning Ledger Co. v. United States, 507 U.S.    , 113 S. Ct. 1670 (1993). Based upon the Supreme Court's holding, respondent has conceded for purposes of this case that the core deposit intangible is amortizable. The parties have agreed on a 10-year useful life and on the percentage of depreciation for the 1984 and 1985 tax years. Therefore, the remaining issue for our consideration is the value of the core deposit intangibles acquired when petitioner purchased ANC. [4]
*308 The trial of this case consumed 6 days and 210 exhibits were received into evidence. Petitioner offered six expert witnesses along with eight expert reports, and respondent offered two expert witnesses and three expert reports. Four of petitioner's experts and one of respondent's experts reached ultimate conclusions with respect to the value of the core deposit intangible. Using substantially similar methods and essentially by manipulating the underlying assumptions, such as the discount rates, petitioner's and respondent's experts reached value conclusions that were incompatible and irreconcilable. The following schedule reflects the expert's name, party represented, method, and value concluded by each expert: Party
Replacement Cost
Cost Savings
Income Method
Name
Represented
Value
Method Value
Value
Curtis
P
no value reached
$ 178,921,000
no value reached
Morgan
P
no value reached
199,665,516
$ 128,677,742
Willamette
Management
Associates
P
$ 165,000,000
175,600,000
155,400,000
McMahon
P
no value reached
228,700,000
155,800,000
BVS
R
25,811,000
41,147,000
25,151,000
Respondent pointed out that the values offered by petitioner's experts did *309 not comport with the $ 275 million purchase price. For example the acquired bank's tangible assets had been assigned a value of $ 138 million and petitioner's expert's core deposit values, when added to the $ 138 million, would exceed the actual purchase price paid for the bank by petitioner. Respondent makes much of this disparity suggesting that this validation test reflects weakness in petitioner's experts' opinions. Petitioner, however, does not claim more than the $ 128 million value for the core deposit intangible reported for tax and financial purposes. Our review of the expert reports and the record herein reflects that both parties' experts, to some extent, advocate positions extruded to the underlying theory's extreme periphery. This lack of impartiality has caused a disservice to the Court and the system of tax administration. Instead of assisting the Court with the expertise to permit the finder of fact to determine the core deposit value, it caused more uncertainty and a broader and less definite panorama of possibilities. To overcome these impediments, we have carefully considered the reports of the experts and selected from each the assumptions or percentages *310 which seem most appropriate in view of the facts and circumstances of this record. Definition of Core Deposits
Core deposits can be an essential part of a commercial bank when they represent a low cost and stable source of funds. Banks typically invest the funds in loans or other income-producing assets, and receive fees for services rendered to the depositors. The excess of the income generated from the core deposits over the associated expenses contributes to the profitability of the bank. Core deposits are a separate and distinct intangible asset with an inherent value because they provide an inexpensive means to generate income. [5] Therefore, when one bank considers acquiring another bank, core deposits can represent an attractive intangible asset and a reason for acquiring a bank. In Citizens & Southern Corp. v. Commissioner, 91 T.C. 463 (1988), *311 affd. per curiam 919 F.2d 1949 (11th Cir. 1990), we held that a core deposit base has an "ascertainable cost basis separate and distinct from goodwill and going-concern value of the Acquired Banks." Id. at 500. The nature of goodwill is the expectancy of continued patronage. Id. at 480 (citing Winn-Dixie Montgomery, Inc. v. United States, 444 F.2d 677, 681 (5th Cir. 1971). The intangible value associated with core deposits is different from goodwill because of their foreseeable turnover and useful life. An account may close because of relocation, death, dissatisfaction with the service, business failure, merger, etc. The intangible value is based on the core deposits acquired in the purchase, not new accounts opened after the transaction, and rests upon the probability that the depositors will leave their funds on deposit for predictable periods of time. Id. at 499-500. "Core deposits are a relatively low-cost source of funds, reasonably stable over time, and relatively insensitive to interest rate changes." Id. at 465. In IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496 (1991), *312 we again emphasized interest rate insensitivity as an important feature of core deposits. Id. at 516. In that case, we stated that "Adjustable rate deposit accounts, such as certificates of deposit, money market deposit accounts, and super NOW accounts, were expressly created in order to allow banks to compete successfully for deposits against other financial intermediaries not bound by the interest rate ceilings applicable to banks." Id. at 517. We found that such accounts were designed to be interest rate sensitive and rate competitive, and would not be treated as core deposits. Id.
Petitioner bears the burden of showing which deposits should be classified as core deposits. Rule 142(a). Both parties agree that the certificates of deposit are not included. Petitioner argues that the NOW, super NOW, and money market accounts should be included as core deposits. Respondent argues that the core deposits are limited to savings and demand deposits. Witnesses testifying on behalf of petitioner stated that NOW, super NOW, and money market accounts were stable and should be considered as part of the core deposits *313 here. The measure of whether a deposit is a core deposit is not based on the stability of the deposit, but more directly upon the interest rate sensitivity of the deposit. Petitioner's witnesses stated that ANB's interest rates were lower than other banks, but they did not state that the rates were not sensitive or competitive in the market. More importantly, petitioner did not show that the NOW, super NOW, and money market accounts were insensitive to market rate fluctuations. Therefore, we hold that petitioner failed to meet its burden of showing that the NOW, super NOW, and money market deposit accounts should be considered part of the core deposit intangible in this case. See also Trustmark Corp. v. Commissioner, T.C. Memo. 1994-184. Fair Market Value of the Core Deposit Intangible
Accordingly, the core deposits petitioner acquired in this case are made up of savings and demand deposits. We now consider the fair market value of that core deposit intangible. The fair market value of property is defined as "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion *314 to buy or to sell, and both having reasonable knowledge of relevant facts." Sec. 25.2512-1, Gift Tax Regs. The sale of the ANC stock for $ 275 million was the result of comprehensive negotiations over several months. Petitioner paid an arm's-length fair market value price for the ANC stock. Therefore, the price of the ANC stock is reliable evidence of the value of ANC's underlying assets. Petitioner elected to treat the purchase of ANC's stock as a purchase of ANC's assets under section 338. Because of that election, the basis allocated to the acquired assets, including the core deposit intangible, is determined by reference to the price paid for the stock. Sec. 338(b). Replacement Cost -- Respondent's expert, Business Valuation Services, Inc. (BVS), determined the fair market value of the core deposit intangible to be $ 25,811,000 using the replacement (development) cost method. One of the attributes respondent asserts is inherent in the replacement cost approach is that a prudent investor would never pay more for an asset than the cost for which the investor could replace or reproduce the asset. Therefore, respondent argues that the replacement cost approach sets the *315 asset's maximum value. The Government in Newark Morning Ledger Co. v. United States, 507 U.S.    ,    , 113 S. Ct. 1670, 1682 (1993), similarly argued that the intangible value associated with the acquired paid subscribers was the equivalent to the cost of generating a list of new subscribers. There the Court stated that The uncontroverted evidence presented at trial revealed that the "paid subscribers" had substantial value over and above that of a mere list of customers. * * * These subscribers were "seasoned"; they had subscribed to the paper for lengthy periods of time and represented a reliable and measurable source of revenue. In contrast to new subscribers, who have no subscription history and who might not last beyond the expiration of some promotional incentive, the "paid subscribers" at issue here provided a regular and predictable source of income over an estimable period of time. The cost of generating a list of new subscribers is irrelevant, for it represents the value of an entirely different asset. * * * [Emphasis supplied.
Based on the evidence before us, we agree that generating new *316 core deposits creates a different asset than seasoned core deposits. Similar to a paid subscriber, it takes years to develop a stable relationship between a bank and its depositors, especially in the middle market. The record reflects that a company in the middle market uses one bank as its sole provider of financial services. Success in the middle market is achieved by banks which build strong customer relationships. Quality relationships take time to develop. Moreover, the ability to self-generate core deposits is an endeavor which, of necessity, must occur over an extended period of time. Use of the replacement method under these circumstances would necessitate a time value analysis and would substantially increase the replacement cost to account for the development time. Further evidence that replacing core deposits substantially differs from purchasing them is shown by petitioner's unsuccessful attempt to break into the middle market in the 1970s. These failed efforts help to persuade us that generating new core deposits is a different type of endeavor and asset than purchasing existing core deposits. Here petitioner was purchasing an existing intangible and ongoing *317 operation. Therefore, based on the record as a whole, we hold that the replacement (development) cost method is an inappropriate way to determine the fair market value of the core deposit intangible purchased by petitioner in this case. See Meredith Corp. v. Commissioner, 102 T.C. 406, 450 (1994). Cost Savings Method -- In prior opinions, this Court has used the cost savings method to value core deposit intangibles. See Citizens & Southern Corp. v. Commissioner, 91 T.C. 463, 510 (1988); IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 514 (1991); Trustmark Corp. v. Commissioner, T.C. Memo. 1994-184; Peoples Bancorporation v. Commissioner, T.C. Memo. 1992-285; Colorado National Bankshares, Inc. v. Commissioner, T.C. Memo. 1990-495, affd. 984 F.2d 383 (10th Cir. 1993). The cost savings method measures the value of the core deposit intangible as the present value of the difference between the cost of the core deposits and the cost of alternative sources of funds. Citizens & Southern Corp. v. Commissioner, supra at 506. *318 The cost savings method has been considered reliable and used to value core deposit intangibles, and it is the best method to value the core deposit intangible in the present case. Using the cost savings method, respondent's expert, BVS, determined the fair market value of the core deposit intangible to be $ 41,147,000. Petitioner's expert, Mr. Robert J. Curtis (Curtis), determined the fair market value of the core deposit intangible, considering only savings and demand deposits, to be $ 180,552,000 using the cost savings method. Petitioner's expert, Mr. Bruce W. Morgan (Morgan), also using the cost savings method, determined the fair market value of the core deposit intangible to be $ 199,665,516. Petitioner argues that a review of the experts' values, including Curtis's and Morgan's, shows that petitioner's claimed value of $ 128,677,742 is at the low end of the range of reasonable core deposit intangible valuations. Therefore, petitioner argues that the amortization deductions it claimed should be allowed in full. The methodology for valuing core deposit intangibles using the cost savings approach was explained in IT&S of Iowa, Inc. v. Commissioner, supra at 514-515, *319 as follows: deposits within the core are identified, based on their stability and insensitivity to fluctuations in market rates of interest. The cost of such deposits is then ascertained, taking into account both explicit interest paid plus the cost of providing services to such accounts, net of service fee income. The life of the deposit base is then calculated, based upon the rate of attrition of deposits within the base. The cost advantage of the deposit base is then found by comparing its cost to the cost of the alternative funding source, which is selected on the basis of its comparability to the deposit base on the basis of characteristics such as risk and expected life. The net cost savings equals the avoided cost achieved by using the deposit base, instead of the alternative, as a funding source over the life of the deposit base, decreased by the income taxes payable upon the savings. The after-tax present value of such cost savings is found by applying a discount factor, based upon the taxpayer's cost of capital, to the net cost savings projected in each year of the deposit core's life. The total stream of such cost savings, together with the tax savings obtained *320 by amortizing the core, equals the value of the deposit core.
We have already identified the core deposits as savings and demand deposits, and the parties have stipulated the rate of attrition of these deposits. We therefore proceed with the calculation and valuation process. (1) Cost of the Core Deposits -- The cost of maintaining the core deposits includes both explicit interest paid and implicit interest. IT&S of Iowa, Inc. v. Commissioner, supra at 521. The experts presented a range of costs associated with the core deposits that were based on the Functional Cost Analysis (FCA) surveys. Each expert used a different FCA year. The most recent FCA survey available at the date of the sale was the 1982 FCA survey. That was the information available to the parties when they established the price for the ANC stock, which included the value of the core deposit intangible. We use the 1982 FCA survey finding it to be the most reliable source of industry information available in this case. The experts made judgmental adjustments to the FCA data skewed toward their client's predilection. Using our judgment, we hold that the most reliable *321 evidence of the cost to maintain core deposits are the percentages determined in the FCA survey. The costs, net of interest, are as follows: Libertyville Bensenville &
ANB (%)
Arlington (%)
Elgin (%)
Demand deposits
5.148
4.938
5.271
Savings deposits
2.844
2.968
3.112
The additional interest expense for the savings deposits is the actual rate of interest paid as of May 1, 1984. The cost of maintaining the core deposits must be reduced by the income associated with the deposits. Using 1982 FCA survey data, we hold that income from the core deposits is as follows: Libertyville Bensenville &
ANB(%)
Arlington (%)
Elgin (%)
Demand deposits
1.350
1.562
2.129
Savings deposits
.119
.105
.107
(2) Cost of An Alternative Source of Funds -- The cost savings associated with the core deposits are measured by comparing their cost against the next most expensive source of funds. An alternative source of funds is selected on the basis of its similarity to the core deposits in terms of average balance size, remaining life, insurability, and risk. IT&S of Iowa, Inc. v. Commissioner, supra at 525 *322 (citing Citizens & Southern Corp. v. Commissioner, 91 T.C. 463, 507 (1988), affd. per curiam 919 F.2d 1949 (11th Cir. 1990)). The cost of an alternative source of funds is the cost of funds equal to the net investable balances of the acquired deposit accounts. To determine the amount of the net investable balances, we reduce the account balances for float and reserve requirements. We agree with Curtis's calculations regarding these amounts. The float requirements are 15.81 percent for demand deposits and .25 percent for savings deposits, and the reserve requirements are 12 percent for demand deposits and 3 percent for savings deposits. Respondent's expert, BVS, opined that the cost of alternative funds was approximately 9.43 percent. BVS looked to the secondary market for 3-month certificates of deposit as an alternative source of funds. Curtis, one of petitioner's experts, based his cost of an alternative source of funds on an average of 5-year certificates of deposit rates of Chicago financial institutions. He determined the cost to be 11.52 percent. Morgan, another of petitioner's experts, determined the cost to *323 be 11.2 percent based on the blended rates for 6-month certificates of deposit to 5-year certificates of deposit. We think that Morgan is correct in using a blended average cost for alternative sources of funds with varying maturity. Core deposits, however, may have a remaining life of less than 6-months and, by their nature, be short term. We use the least expensive alternative source of funds to determine the cost savings, which appears to be 3-month certificates of deposit. Therefore, we adjust the cost to include 3-month certificates of deposit, but we do not rely exclusively on short-term alternative sources. Accordingly, we use a 10-percent overall cost of alternative sources of funds. (3) Net Cost Savings -- The cost savings is the avoided cost achieved by using the core deposits instead of the alternative source of funds decreased by the income taxes payable on the savings. BVS and Morgan both used a 50-percent tax rate, but Curtis used a 21.6-percent tax rate. We agree with BVS and Morgan that the correct tax rate is 50 percent, which is approximately petitioner's marginal corporate (State and Federal) tax rate. (4) Discount Factor -- A discount rate is applied *324 to the net cost savings associated with the core deposits over the useful life to determine its present value. IT&S of Iowa, Inc. v. Commissioner, supra at 530. Petitioner's experts used a weighted average cost of capital as the discount value. We agree that a weighted average is appropriate in this case. Curtis calculated a 16-percent discount rate and Morgan used a 10.685-percent discount rate. Morgan's rate is based on the weighted average cost of capital to finance the purchase of ANC. Curtis's rate is an overall weighted average cost of capital for banks similar to petitioner. We agree with Curtis that a market weighted average cost of capital is the appropriate discount rate. Therefore, the 16-percent discount rate determined by Curtis is the most appropriate rate to use. (5) Tax Savings -- We have held that it is appropriate to increase the value of the core deposit intangible by the value of the tax deductions attributable to the amortization of the intangible asset. IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 514, 532 (1991). Petitioners must establish that the tax savings are reasonable. *325 Id. Curtis determined petitioner's effective tax rate as 21.6 percent. We have approved of the application of an effective tax rate to calculate the cost savings, and we agree that the same rate is appropriate in the instant case. Id. at 533; Citizens & Southern Corp. v. Commissioner, supra at 506-507. The foregoing holdings should be sufficient to permit the parties to compute the value of the core deposit intangible, and An appropriate order will be issued.
APPENDIX The ANC banks' deposits acquired are assumed to have remained at the banks in accordance with the following schedule: Years After
Remaining %
Acquisition
(Survival Rate) 0
100     1
90.3828
2
82.1727
3
74.6541
4
67.7813
5
61.3536
6
55.3722
7
49.8571
8
44.8721
9
40.2205
10
36.0252
11
32.3617
12
28.9507
13
25.8957
14
23.1535
15
20.6118
16
18.2077
17
15.9142
18
13.7254
19
11.6574
20
9.6896
21
7.8640
22
7.1765
23
6.5213
24
5.8729
25
5.2506
26
4.6423
27
4.0754
28
3.5790
29
3.0850
30
2.6266
31
2.1799
32
1.8240
33
1.4938
34
1.1868
35
.9985
36
.8335
37
.6855
38
.5496
39
.4380
40
.3280
41
.2586
42
.1976
43
.1505
44
.1107
45
.0771
46
.0480
47
.0233
48
.0074
49
.0016
50
[1] 0
*326 Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. The acronym "NOW" stands for "negotiable order of withdrawal".↩
3. The summary by bank of the deposits is as follows: ANB-Chicago
ANB-Libertyville ANB-Arlington
ANB-Bensenville
Savings
$ 62,433,939
$ 23,805,031
$ 13,543,410
$ 19,462,414
Demand
1,000,002,914
24,640,091
15,434,494
18,879,785
NOW
52,755,198
10,090,523
3,206,582
5,195,819
Super-
NOW
0
0
0
389,335
Money
market
151,297,975
21,049,122
9,685,744
6,428,180
CD's
1,032,131,964
49,128,702
30,001,111
41,956,846
Total
2,298,621,990
128,713,469
71,871,341
92,312,379
↩
ANB-Elgin
Savings
$ 4,583,942
Demand
7,543,281
NOW
1,186,584
Super-
NOW
220,981
Money
market
5,667,920
CD's
9,238,625
Total
28,441,333
4. In the notice of deficiency, respondent determined the entire amount claimed by petitioner as an amortizable core deposit intangible was not allowable as such and that the amount represented goodwill, an unamortizable intangible. Accordingly, to the extent that petitioner fails to show that some or all of the $ 128,677,742 should be allocated to the core deposit intangible category, that amount would remain unamortizable goodwill, as determined by respondent.↩
5. Traditionally, core deposits are actually liabilities or obligations of the bank to depositors, but also represent a low cost source of funds with value to a banking investor.↩
1. Less than .00005 percent.↩