FEDDERS CORPORATION and Subsidiaries, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent, BORG-WARNER CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fedders Corp. v. Commissioner
Docket Nos. 6053-75, 6476-75.
United States Tax Court
T.C. Memo 1979-350; 1979 Tax Ct. Memo LEXIS 175; 39 T.C.M. (CCH) 1; T.C.M. (RIA) 79350; September 4, 1979, Filed Lawrence N. Weiss, for the petitioners in docket No. 6053-75. Joseph E. McAndrews,Nora A. Bailey, and Neal F. Farrell, for the petitioner in docket No. 6476-75. Marwin A. Batt, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Docket No.
Year Ended
Deficiency
6053-75
August 31, 1968
$7,606,216.89
August 31, 1969
7,141,349.10
August 31, 1970
557,506.00
6476-75
December 31, 1968
6,316,749.57
The primary issue for our decision is the allocation of the purchase price paid by Fedders Corporation for Borg-Warner Corporation's Norge Division. The resolution of this issue depends, in part, upon whether petitioners made a bona fide allocation of the purchase price in their sales contract and upon whether any intangible assets of value were sold to Fedders. If we determine that Fedders *177 acquired valuable intangible assets, we must then decide whether such assets were abandoned, thus giving rise to an abandonment loss. Also at issue is whether Borg-Warner is entitled to a worthless stock loss under section 165(g)(3) [1] for stock in its subsidiary, Warren-Connolly Company. [2]
*178 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations of facts and attached exhibits are incorporated herein by this reference. The petitioner Fedders Corporation (Fedders) is a New York corporation and had its principal office at Edison, New Jersey, at the time of filing the petition herein. It filed its Federal income tax returns as consolidated returns on the accrual basis on behalf of itself and its subsidiaries for the years at issue with the office of the Internal Revenue Service at Philadelphia, Pennsylvania. The petitioner Borg-Warner Corporation (Borg-Warner) is a Delaware corporation and had its principal office at Chicago, Illinois, at the time of filing the petition herein. It filed its original Federal income tax return for 1968 and an amended return on the accrual basis with the office of the Internal Revenue Service at Chicago, Illinois. Fedders and Borg-Warner are unrelated publicly owned corporations whose stocks are traded on the New York Stock Exchange. On July 1, 1968, BorgWarner sold its Norge Division (Norge) to Fedders for $45,213,255, its net book value. Payment was made with $20 million in cash, *179 a negotiable subordinated promissory note in the face amount of $13,213,255, with interest at 7 percent, maturing in 1980, a non-negotiable promissory note in the face amount of $3,600,000, with interest at 7 percent, maturing in 1969, and 210,000 shares of Fedders common stock, $1.00 par value, with a total market value of $8,400,000. Additionally, Fedders assumed certain liabilities of the Norge Division. Borg-Warner is a diversified manufacturer, which is engaged primarily in the production of chemicals and plastics, builder and consumer products, industrial equipment, specialty steels, and automotive equipment. Until it sold its Norge Division to Fedders, Borg-Warner, through that Division, manufactured and marketed a line of "white goods" appliances, consisting of home laundry equipment and gas and electric ranges, and commercial laundry and dry cleaning equipment. The Norge Division also marketed refrigerators, freezers, dishwashers, food waste disposals, water heaters, and ranges manufactured by others. In addition, the Norge Division manufactured and marketed room air conditioners. With the exception of private label sales (sales to retailers who market products under *180 their own names), Borg-Warner sold its white goods appliances under the Norge brand name. It sold its room air conditioners under the names "Norge" and "York." Although these products, and advertising with respect to them, sometimes bore the trademarks "Borg-Warner" or "BW," the Norge Division did not advertise or promote the Norge name with either of these trademarks other than in a manner which showed that Norge was a division of Borg-Warner and that Borg-Warner had financial responsibility for the Division. Norge products were marketed outside the United States, under the Norge name, through Borg-Warner International Corporation, a subsidiary of Borg-Warner. The Norge Division had been operated by BorgWarner since 1929, when Borg-Warner acquired Detroit Gear, which at the time manufactured refrigerators under the Norge name. From the time of its acquisition by Borg-Warner until World War II, the Norge Division operated successfully. It manufactured one of the first plug-in types of refrigerators. Around 1936, it was second only to the Frigidaire Division of General Motors in the sale of refrigerators. After World War II (during which it engaged entirely in the production of *181 war products), Norge returned to the appliance business. In order to meet competition, it quickly put into production a freon compressor for refrigerators to replace the sulphur dioxide system it had manufactured before the War. Norge had not concentrated on developing the new compressor prior to the War and it was not sufficiently tested before being marketed. It was defective and resulted in many refrigerator failures. The Norge Division spent approximately $16 million to fulfill its commitments under warranties by replacing defective refrigerators and parts. Norge also redesigned the defective compressor. Largely because of these expenditures, Norge was not profitable during the period 1949-1952. In the early 1950's, the Norge Division developed new products, primarily automatic washers and dryers, and thereby expanded its product line beyond refrigerators. However, in the opinion of Borg-Warner's board of directors and top management, the Norge Division lacked the type of management required to effectively merchandise its white goods appliances. In order to solve this problem, in 1954 Borg-Warner hired Judson S. Sayre to serve as president of the Norge Division. Mr. Sayre *182 had a long, successful history in the white goods appliance business and had acquired the reputation in the industry of being the "father of the automatic washer" because of his very successful efforts to manufacture and market this product as president of the Bendix Corporation. Mr. Sayre served as president of the Norge Division from 1954 to 1960, and during this period, Norge was very successful in increasing sales and profits. These increased sales and profits resulted from increased advertising, increased research and development for new products, improvements in product design, improvements in manufacturing and marketing procedures, and changes in personnel at the manufacturing and distribution levels. During Mr. Sayre's tenure as president of the Norge Division, the Division invented a dry cleaning machine, which it merchandised through a franchise operation known as Norge Villages (the sale of coin operated laundry and dry cleaning equipment), and also constructed a modern refrigerator plant in leased premises at Fort Smith, Arkanasas, in order to expand refrigerator production. Mr. Sayre resigned as president of the Norge Division in 1960, although he continued as *183 chairman and chief executive officer of the Division until 1962. During the early 1960's, the Norge Division experienced substantial losses, because of overexpansion of the Norge Village franchising operation, over-capacity in the refrigerator plant at Fort Smith, and poor management. The Norge Village business became oversaturated and there were substantial failures of these franchise operations, which were undercapitalized. Norge, which had financed the franchises, incurred substantial losses in the years 1962 through 1966 because of these failures. In addition, although it had originally anticipated that it would be able to generate sufficient additional sales to use to full capacity the new Fort Smith refrigerator plant, Norge was unable to do so and, therefore, had unabsorbed overhead costs at this plant. The Fort Smith lease and manufacturing facilities were sold to Whirlpool Corporation in 1966 and Norge began at that time to purchase refrigerators from the Kelvinator Division of American Motors and to market them under the Norge name. Some members of Borg-Warner's board of directors had always had reservations about the Norge Division. While most of Borg-Warner's business *184 was of an industrial type, Norge's business was in consumer products, required comparatively higher advertising and selling budgets, and was more dependent upon volume sales to make a profit. Norge had proved unable to earn a rate of return on its investment that compared favorably with other Borg-Warner divisions. Although dissatisfaction among the board of directors was quelled during the years that Mr. Sayre consistently produced profits for Norge, it came to the fore again when Norge incurred losses in the early 1960's. In the early 1960's, management actively considered disposing of the Norge business. One alternative considered was a liquidation, but it was rejected because it was estimated that large losses would be sustained on inventories and receivables of the Norge Division in a liquidation. Borg-Warner also considered a merger of the Kelvinator Division of American Motors and Norge into a separate corporation, but the Antitrust Division of the United States Department of Justice did not approve the merger. Borg-Warner had discussions with several other companies during the period 1963-1965 regarding the sale of the Norge Division, none of which progressed to the *185 point of serious negotiations. When none of the alternatives proved attractive, management decided to sell the Fort Smith plant, thereby reducing unused capacity, to employ new management in an effort to make the Norge Division profitable, and to defer a decision as to its future. Alonzo B. Kight, who had been president of the Borg-Warner International Corporation and had had experience in merchandising Norge products through that position, was installed as president of the Norge Division in 1965. Mr. Kight's efforts were directed to improving the financial position of Norge. A major innovation during this period was an increase in Norge's private label business, which was principally with Montgomery Ward. Norge's private label business constituted approximately 18 percent of its gross sales in 1966 and 23 percent in 1967. The sales, pre-tax profit, Federal income and excess profits tax, and net income after tax of the Norge Division for each of the years 1950 to July 1968 were as follows: Federal
Net Profit
Incomc &
[1]/
or Loss
Excess
Net Income
Year
Sales
Before Tax
Profits Tax
After Taxes
1950
$62,904,862
$ (2,319,785)
$ (2,319,785)
1951
47,448,638
(9,255,045)
(9,255,045)
1952
46,438,349
998,998
$599,399
399,599
1953
43,142,370
(1,432,929)
13,229
(1,446,156)
1954
73,769,608 4,101,144
2,132,595
1,968,549
1955
128,966,393
11,746,293
6,274,472
5,471,821
1956
110,966,791
7,796,926
4,054, 401
3,742,525
1957
93,418,446
5,152,024
2,679,053
2,472,971
1958
91,394,444
4,906,779
2,551,525
2,355,254
1959 119,695,452
9,257,658
4,687,986
4,569,672
1960
85,333,538
(1,272,181)
798,696
(2,070,877)
1961
114,525,678
6,9 61,318
3,619,885
3,341,433
1962
117,456,385
5,401,772
2,808,922
2,592,850
1963
98,897,106
(13,749,991)
(6,639,1 40)
(7,110,851)
1964
113,102,477
(6,687,469)
(3,343,735)
(3,343,734)
1965
107,267,876
(8,598,012)
(8,598,012)
1966
124,951,484
58,658
28,189
30,468
1967
112,204,718
1,008,950
1,008,950
1968(6 mos)
68,206,185
2,066,497
1,091,110
975,387 [2]/
*186 In the ten years preceding the sale of the Norge Division to Fedders, Norge's share of the appliance market declined. With respect to washers, dryers, and refrigerators, the decline was more marked in sales under the Norge name while Norge's share of the private label market remained more stable. Prior to its acquisition of Norge, Fedders was engaged primarily in the manufacture and sale of air conditioning equipment and had an excellent reputation in the air conditioning industry. The majority of its air conditioners were sold by appliance dealers. Fedders felt that appliance dealers were most familiar with the manufacturers of a full line of home appliances and tended to promote these brands more than others. Fedders decided that a full white goods line would give it a marketing advantage and in 1964 decided to expand its business. In 1964, Fedders entered into a supply contract with the Franklin Division of Studebaker *187 Industries for refrigerators, freezers, washers, and dryers. However, this arrangement proved unsatisfactory because Fedders had little control over the production schedules and product quality and found it was unable to sell these products at a competitive price. Fedders decided that it should manufacture its own products and began in 1965 by expanding its plant in Edison, New Jersey, to enable it to produce refrigerators. Fedders invested $7,000,00 in its expanded facilities at Edison. At the time of its acquisition of Norge, production of refrigerators was proceeding in accordance with Fedders' plans, but had not reached a large enough volume to absorb expenses. In order to accelerate its entrance into the white goods appliance industry, Fedders desired to acquire a company in that field. Fedders negotiated with Studebaker Industries to acquire the Franklin Division, but the negotiations terminated without an acquisition. Fedders considered Norge an attractive company for its purposes because: (1) Norge sold 150,000 refrigerators annually, but had no manufacturing facility for refrigerators so there would be no duplication of manufacturing facilities for this appliance; *188 (2) Norge had an established brand name in the home laundry business while Fedders had not begun production; (3) Norge manufactured and sold about 125,000 room air conditioners annually and this operation could be consolidated with Fedders' production; (4) Fedders would acquire existing distribution outlets and manufacturing facilities at less than present day prices; and (5) the combined companies would have prospective sales of 250 to 300 million dollars and savings would result from a merger of sales, advertising, and administrative operations. When Fedders contacted Borg-Warner, Borg-Warner indicated it would consider selling Norge at net book value and negotiations ensued. At first, Borg-Warner insisted upon receiving the purchase price in cash, but in March or April, 1968, agreed to payment of part of the price with securities and notes. On July 1, 1968, Borg-Warner and Fedders entered into an agreement, pursuant to which Borg-Warner sold its Norge Division as a going concern to Fedders for a purchase price equal to the net book value of Norge as of June 30, 1968. Borg-Warner agreed to sell and Fedders agreed to purchase the assets and rights relating to the operation *189 of Norge that were listed in the contract, regardless of whether said assets and rights were shown on Norge's audited balance sheet, as agreed upon, for purposes of determining the purchase price.
The following assets and rights were specifically included: (1) Installments and accounts receivable, inventories, prepayments, deferred items, and fixed assets; (2) Specified patents (except that Borg-Warner retained a royalty-free nonexclusive license), patent applications, inventories, copyrights, license rights (subject to a royalty-free sublicense in Borg-Warner), and specified trademarks and tradenames together with the goodwill appurtenant thereto; (3) Drawings, blueprints, specifications, designs, and data prepared by Norge; (4) Catalogues, brochures, sales literature, promotional material, and other selling material relating to the operations of Norge. (5) Books of account, records, files, invoices, customers' lists, suppliers' lists, and other data relating to the operations of Norge, except its general ledger; (6) Rights of Borg-Warner under all contracts, licenses, leases, commitments, sales orders, and purchase orders that Fedders agreed to assume; (7) All other *190 assets and rights of every kind and nature, real or personal, tangible or intangible, which were owned by and used by Borg-Warner solely in connection with the business of its Norge Division whether or not such assets were reflected in the audited balance sheet, upon which the purchase price was determined, except the assets and properties specifically excluded from the sale; and (8) Outstanding stock of Warren-Connolly Company, Inc., Norge Appliance & Sales Co. of California, Inc., Norge Appliance & Sales Co. of Florida, Inc., Norge Appliance & Sales Co. of New Jersey, Inc., Norge Appliance & Sales Co. of Pennsylvania, Inc., Norge Applicance & Sales Co. of Texas, Inc., and Norge Appliance Sales & Service, Inc.
The principal trademark specified was "Norge" which was registered in 52 countries. However, "Norge" is the Norwegian name for Norway and, because of its geographical significance, Borg-Warner had had a difficult time registering it in some foreign countries. Exhibits to the agreement included a list of 77 Norge domestic distributors, private label contracts with Montgomery Ward and others, leases, employment agreements, Norge Village franchise agreements, and a list *191 of commercial laundry distributors. The following assets and rights were specifically excluded: (1) Cash and securities; (2) The trademarks and trade names "Borg-Warner" and "B-W"; (3) Accounts receivable due from Borg-Warner, its divisions, and its subsidiaries; (4) Tax refund claims; (5) Insurance contracts with certain exceptions relating to products liability insurance; (6) Inventions, patents, and patent applications (a) in the field of thermoelectrics, (b) in the field of hydrostatic transmission, and (c) covering or relating to any product or process in the developmental stage; and (7) A claim against Whirlpool Corporation for accrued rents.
The agreement provided that the net book value of Norge would be determined by an audited balance sheet prepared by Peat, Marwick, Mitchell & Co., certified public accountants employed by Borg-Warner, and approved by Arthur Young & Company, certified public accountants for Fedders. A Pro Forma Balance Sheet was attached to the contract and set forth all assets and liabilities that were to be shown on the audited balance sheet. Peat, Marwick, Mitchell & Co. submitted to Arthur Young & Company the following audited balance *192 sheet: NORGE DIVISION OF BORG-WARNER CORPORATION AND WARREN-CONNOLLY COMPANY, INC.
Combined Balance Sheet June 30, 1968 Assets
Current assets: Receivables: Notes: Trade and customer
$ 3,101,401
Installment contracts (including
amounts due after one year)
2,076,183
Accounts: Trade and customer
19,484,321
Other
571,876
25,233,781
Less allowance for doubtful receivables
1,450,297
Receivables, net
23,783,484
Inventories of finished goods, work in process,
materials, and supplies, at the lower of cost
(first-in, first-out) or market
28,240,205
Prepaid expenses
923,496
Total current assets
52,947,185
Property, plant, and equipment, at cost
Land $ 14,850
Buildings and land improvements
6,634,266
Machinery and equipment
7,138,177
Construction in progress
30,976
13,818,269
Less accumulated depreciation
5,366,721
Property, plant, and equipment, net
8,451,548
Deferred charges and other assets, less amortization
515,055
61,913,788
Liabilities and Divisionsl Equity
Current liabilities: Accounts payable
10,590,357
Accrued expenses
4,104,924
Total current liabilities
14,695,281
Provision for extended warranties
1,135,252
Divisional equity contingent liabilities
46,083,255
$61,913,788
*193 The accounting firms, however, were unable to reach an agreement on all items. The final purchase price was determined by executives of Borg-warner and Fedders to be $45,213,255, without audit and without resolution of the disputes over specific items. Fedders also agreed to assume liabilities of Norge shown on its audited balance sheet.
The copyrighted materials included in the sale of the Norge Division had no significant value. Because appliance models are modified annually, service and sales training manuals become outdated very quickly. In the white goods appliance industry, the only patents that are valuable are those that cannot be easily circumvented and that can be licensed to other manufacturers for a royalty. None of the patents included in the sale of the Norge Division fall within this definition. The white goods appliance industry consists of the manufacture of washers, dryers, ranges, refrigerators, freezers, and dishwashers. It is a cyclical industry, which is subject to conditions in the housing market, inflation, and money availability. It requires a large capital investment and substantial expenditures for advertising. Because of high overhead, it *194 is difficult to make a profit without a large volume of sales. In the 1960's, profits in the industry declined because prices of appliances decreased while costs increased. A good system of distribution is extremely important in the appliance business. Appliances may be distributed through independent distributors, factory branches, or dealers' buying groups. Norge marketed approximately 40 percent of its domestic products through independent distributors, a procedure whereby an independent businessman has an exclusive right to sell Norge products to dealers. Independent distributors buy goods from the manufacturer on a nonrecourse basis for sale to dealers, who operate retail stores and sell white goods appliances to the ultimate consumer. The bulk of dealers sell more than one manufacturer's line of white goods appliances, whereas a distributor carries only one white goods line. In the white goods appliance industry, the independent distributor serves both a warehousing and sales and service function for a manufacturer's products. The distributor supplies inventory, service parts, and service facilities to dealers and finances dealer purchases. The distributor provides *195 a marketing program for the manufacturer's products and employs salesmen to market the manufacturer's line to dealers. The independent distributor is required to have a substantial capital investment at risk in his business to carry inventory, parts and dealer receivables. Expenditures are also required to support a marketing program, including advertising, sales promotion activities and displays.
Norge marketed approximately 20 percent of its domestic products through eight Norge factory branches. Major appliance manufacturers generally prefer the independent distributor arrangement, which provides an independent relationship with an entrepreneur who has a large investment in inventory and a real profit motive to sell the manufacturer's products. If a manufacturer operates through a factory branch, it has substantial capital requirements to carry inventory until it is sold to dealers, carry dealer receivables, employ managers, salesmen and servicemen, and support the marketing program that must be maintained for dealers. It also has to rely on managers who have no entrepreneurial stake in the enterprise. Dealers' buying groups are groups of dealers who buy directly from the *196 manufacturer and eliminate the role of the distributor. A brand name that is widely recognized and that represents a reputation for good performance and durability is an important asset in attracting distributors and dealers. A distributor can generally sell a larger volume and make a greater profit with a good brand name and also usually has fewer service requirements. It is difficult for a manufacturer with a new name to attract distributors and dealers but once a good name is established the distributors and dealers help to maintain it because they usually give the best known brand name the most prominent display space. It is common in the major appliance industry for white goods appliance distributors to also carry a "brown goods" line (televisions, radios, and stereos). Many of the Norge distributors had strong brown goods lines, Zenith or Motorola, which associations strengthened the distributorships. A brand name is established and maintained primarily through advertising and good performance. Brand names are not transferable from one industry to another or from one major appliance to another. In Order to establish consumer awareness of a new brand name in the *197 white goods appliance industry, a company would have to spend about $18 million for advertising over five years, and might spend as much as $8-10 million a year for several years. Once having established consumer awareness, the company would have to continue to spend large amounts in advertising to maintain consumer awareness. However, the fact that consumer awareness has been established does not guarantee that a product will be successful. Performance, reputation, and service are necessary to a successful product. In the period from 1965 through 1967, average annual traceable advertising (television, magazines, and newspaper supplements) of the top ten major appliance manufacturers was $2,067,000. Borg-Warner spent $859,000, $1,096,000 and $1,043,000 in each of those years, respectively, and ranked eighth, eighth, and seventh, respectively. The average total annual expenditures, including no traceable advertising, were approximately $3,000,000 in the period 1965-1967. Approximately 20-25 percent of consumers consult Consumers Union reports before purchasing a major household appliance. Over the years 1960-1968, Norge washers and dryers showed a downward trend in Consumers *198 Union reports. Norge refrigerators maintained a more stable position. Following the acquisition of Norge, Fedders made major administrative changes. In accordance with plans formulated prior to the purchase, Fedders eliminated duplicative administrative sales and personnel functions by disbanding the Norge headquarters in Chicago and absorbing its functions at Fedders' headquarters in Edison, New Jersey. Within two months, essentially all Norge personnel had been discharged or had left Norge voluntarily. Prior to the acquisition of Norge, Fedders had not made a detailed investigation of Norge's distribution system and Fedders was disappointed when it took over the operation of Norge. Borg-Warner had dealt with its independent distributors on an individual basis, granting price concessions, advertising funds, and lenient credit policies to those distributors who demanded or needed such help as a prerequisite to doing business. Fedders felt that these policies placed too great a financial burden on Norge and instituted uniform treatment of all distributors. At least partially because of these changes, Fedders lost 38 out of 77 distributors in the first two years after the *199 acquisition and lost eight more in the third year. These distributorship contracts were cancelled in some instances by Fedders and in others by the distributor. Fedders also closed seven out of eight Norge factory branches and combined Norge's Chicago branch with Fedders' Chicago branch. Fedders was interested in distributing its products through dealers' buying groups (see p. 25, supra) and approached two large buying groups. The groups, however, showed little interest in Norge. Fedders felt that Norge's dealer structure was very poor and that this made it difficult to obtain distributors. They also believed the lack of dealers diminished the value of consumer advertising because many consumers would not be able to find a dealer from whom they could buy Norge appliances. Therefore, Fedders decided to emphasize advertising in trade publications with the intent of building up demand among dealers. Trade advertising is less expensive than consumer advertising and Fedders spent considerably less on advertising than Borg-Warner had spent. Fedders encountered problems with the quality of the Norge dryer that had been introduced in May 1968 and in 1969 Fedders retooled. In *200 1970, Fedders retooled for the Norge washer. Within a few days of the acquisition, Kelvinator, from whom Norge purchased washers, was sold to White Consolidated Industries, which increased prices by ten percent. Because of Kelvinator's increased price, Fedders tried to rapidly increase its own production of refrigerators. These efforts resulted in lower quality. Fedders marketed its appliances under both the Norge and Fedders names. It sold identical air conditioners under both names, charging a higher price for the Fedders air conditioner. For a period in the early 1970's, Fedders used the name "Norge by Fedders," emphasizing the name Norge. The total dollar volume of appliances sold under the Norge and Fedders names for the years 1969 through 1976 was as follows: Refrigerators
Freezers
Year
Norge
Fedders
Norge
Fedders
1969
$14,547,743
$2,476,841
$3,955,828
$ 246,558
1970
12,887,424
336,512
4,591,275
61,438
1971
21,885,776
4,477,275
1972
17,933,294
8,123,392
1973
15,275,700
7,579,600
1974
1,963,723
358,065
1975
1976
Dishwashers
Electric Ranges
Gas Ranges
Norge
Norge
Norge
1969 $ 690,480
$1,926,586
$ 2,484,736
1970
1,027,876
2,468,500
2,607,396
1971
1,627,114
2,605,630
1,963,488
1972
1,887,666
2,898,501
1,188,506
1973
1,884,114
2,844,100
1,283,975
1974
686,268
218,523
297,966
1975
897,339
1976
626,085
*201 Commercial Washers
Commercial Dryers
Commcrcial Dry Cleaners
Norge
Norge
Norge
1975
$1,299,710
$158,038
$407,931
1976
1,706,035
362,810
471,005
Norge
Automatic
Wring
Electric
Gas
Washers
Washers
Dryers
Dryers
1969
$12,741,246
$1,641,804
$3,987,605
$ 4,550,700
1970
15,263,690
1,292,736
4,641,480
4,687,850
1971
17,074,224
1,526,694
5,287,590
4,018,014
1972
2 0,674,452
523,068
3,883,125
3,752,567
1973
15,565,940
39,312
4,963,872
2,865,968
1974
3,603,076
79,716
1,548,039
569,432
1975
28,291,957
9,464,096
3,586,981
1976
38,225,346
14,077,064
5,903,175
During the four years following the sale, Fedders expended the following amounts on capital improvements relating to Norge: 8/31/69
8/31/70
8/31/71
8/31/72
Land Improvements
$ 33,515 $ 28,510 $ 150,349
$ 12,369
Land
100,000
129,415
11,443
29,684
Leasehold
Improvements
15,247
Buildings
102,358
121,647
3,272,307
62,466
Machinery and
Equipment
347,540
1,474,661
957,696
294,261
Vehicles
3,200
5,000
Furniture and
Fixtures
5,833
18,522
12,545
6,133
Jigs and Dies
237,937
1,044,839
2,097,893
582,390
Total
$830,383
$2,832,841
$6,502,233
$992,303
*202 During the ten years preceding the sale of Norge, Borg-Warner spent the following amounts on capital improvements to fixed assets [3] in the Norge Division: Year
Fixed Assets Additions
1958 $ 134,690
1959
1,418,230
1960
1,020,077
1961
6,716,033 [1]
1962
1,591,163
1963
2,903,467
1964
3,884,681
1965
1,782,683
1966
1,043,888
1967
678,047
1968 (6 months)
425,920
OPINION Fedders and Borg-Warner made different allocations of the purchase price paid for Norge on their tax returns. Fedders allocated the purchase price to the individual assets according to their book values, with certain adjustments which it thought more accurately reflected market values. Fedders allocated no part of the purchase price to intangible assets. Borg-Warner independently determined the fair market value of each asset and allocated the sales proceeds to the individual *203 assets according to their relative fair market values. According to its determination, the total fair market value of the Norge assets was $113,229,231 and the fair market value of the intangible assets was $45,000,000. Allocating the sales proceeds on this basis, it attributed $22,171,068 to intangible assets. [4]
Respondent determined deficiencies against both parties to the transaction, using Fedders' allocation to determine the deficiency against Borg-Warner and using Borg-Warner's allocation to determine the deficiency against Fedders. [5] He takes the position of a stakeholder, leaving it to the Court to resolve the differences between the parties in accordance with the well established rule that, upon the sale of a going business, the purchase price must be allocated among the individual assets to determine the seller's gain or loss on each asset and to establish the buyer's basis in each asset. Watson v. Commissioner, 345 U.S. 544, 552 (1953); F. & D Rentals, Inc. v. Commissioner, 44 T.C. 335, 346 (1965), *204 affd. 365 F.2d 34 (7th Cir. 1966). See section 1,344-1(c)(4)(viii), Income Tax Rege.
Initially, we must dispose of a procedural issue raised by Fedders. In the notice of deficiency sent to Fedders, respondent allocated a portion of the *205 purchase price to "goodwill." Fedders contends that some intangible assets, such as going-concern value, are distinct from goodwill and that respondent has the burden of proof with respect to the existence of any intangibles that are not encompassed by the term "goodwill." When respondent raises a new matter that was not included in his notice of deficiency to the taxpayer he has the burden of proof with respect to that matter. See Rule 142(a), Tax Court Rules of Practice and Procedure. A new theory or reason that is presented to sustain a deficiency is treated as "new matter" when it increases the amount of the deficiency, requires presentation of different evidence, or is inconsistent with respondent's original determination. Estate of Emerson v. Commissioner, 67 T.C. 612, 620 (1977); Florists' Transworld DeliveryAssn. v. Commissioner, 67 T.C. 333, 348 (1976); Sanderling, Inc. v. Commissioner, 66 T.C. 743, 757-758 (1976), affd. 571 F.2d 174 (3d Cir. 1978). However, when respondent has merely clarified or developed his original determination without raising new factual issues or altering the amount of the *206 deficiency, the burden of proof does not shift to him. Estate of Jayne v. Commissioner, 61 T.C. 744, 748-749 (1974); McSpadden v. Commissioner, 50 T.C. 47,, 493 (1968).
We recognize that some cases distinguish going-concern value from goodwill. See, e.g., VGS Corp. v. Commissioner, 68 T.C. 563, 591 (1977). But, there are also cases that find it unnecessary to make such a distinction. See Winn-Dixie Montgomery, Inc. v. United States, 444 F.2d 677, 685 (5th Cir. 1971); Computing & Software, Inc. v. Commissioner, 64 T.C. 223, 234-235 (1975). Goodwill has been recognized as a broad and elusive concept. The Supreme Court, in Menendez v. Holt, 128 U.S. 514, 522 (1888), defined goodwill as -- every positive advantage that has been acquired by the old firm in the progress of its business, whether connected with the premises in which the business was previously carried on, or with the name of the late firm, or with any other matter carrying with it the benefit of the business. * * * See also, In re Brown,242 N.Y. 1, 150 N.E. 581 (1926) ("any privilege that gives a *207 reasonable expectancy of preference in the race of competition"). This Court has also on occasion taken a broad view of goodwill, stating that it "may arise from: (1) The mere assembly of the various elements of a business, workers, customers, etc., (2) good reputation, customers' buying habits, (3) list of customers and their needs, (4) brand name, (5) secret processes, and (6) other intangibles affecting earnings." Staab v. Commissioner, 20 T.C. 834, 840 (1953). Whatever may be the substantive ramification of the difference between "goodwill" and "going-concern value," we think it clear that, in a procedural context, no new factual issues can be said to have been raised by arguments made under the rubric of respondent's use of the term "goodwill" with respect to going-concern value, brand name, distributorships, or other intangible values. Moreover, Fedders has been represented by competent counsel throughout this proceeding and there is no evidence that they were misled by respondent's notice of deficiency. Accordingly, we hold that no new matters have been raised by respondent and the burden of proof does not shift to him. Nevertheless, we are constrained *208 to note that our decision herein would be the same, regardless of which party has the burden of proof. See pp. 65-66, infra. We turn now to the substantive dispute between the parties. Fedders claims that it acquired certain assets of the Norge Division, that these assets were valued by the parties at their book values through arm's length negotiations, and that the intangible assets were valued at zero. [6] According to Fedders, Borg-Warner is now attempting to vary the terms of their agreement in contravention of the rule in Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), that a party to a contract may challenge the tax consequences of his agreement only if he proves it is unenforceable against the other party to the contract because of mistake, undue influence, fraud, duress, etc. 378 F.2d at 775. In the alternative, Fedders argues that the purchase price should be allocated according to the negotiated book values because that allocation is in accord with economic reality. Borg-Warner contends that the purchase price was a lump-sum payment for Norge as a going business, that no *209 allocation of the price among specific assets was made, and that it is the task of this Court to make such an allocation. We think that Borg-Warner has grimed the issue correctly. It is clear that Fedders did not acquire certain assets of the Norge Division, but rather acquired the entire business as a going concern, with certain minor exclusions. The preamble of the contract stated that the seller desires to sell and the buyer desires to purchase the "business and its assets, including the good will of said business as a going concern." In accordance with the contract, Borg-Warner retained certain assets (see pp. 19-20, supra) and assigned to Fedders specifically enumerated assets and All other assets and rights of every kind and nature, real or personal, tangible or intangible, which are owned by and used by Seller [Borg-Warner] solely in connection with the business of Division [Norge], whether or not such assets are reflected in the Pro Forma Balance Sheet or are to be reflected in the Audited Balance Sheet * * * Moreover, the Pro Forma Balance Sheet, *210 Which set forth all assets that were to be included in the Audited Balance Sheet, included patents and goodwill. The fact that a few assets were excluded from the transaction does not impair the going-concern nature of the business. See Winn-Dixie Montgomery, Inc. v. United States, 444 F.2d at 679-680.
It is also clear that the parties did not allocate the price among the individual assets in their agreement. The sales contract is written in terms of a purchase price equal to net book value and makes no reference whatsoever to allocation of that price. See Winn-Dixie Montgomery, Inc. v. United States, 444 F.2d at 679. That no allocation was intended is evidenced from the fact that the parties agreed upon the final purchase price without resolving their dispute over the book value of certain assets. We do not question the testimony of the current president of Fedders that Fedders refused to pay anything for intangibles. But, we think this is merely evidence that Fedders would not pay a premium over net book value and not that the parties agreed to an allocation of the purchase price. See Winn-Dixie Montgomery, Inc. v. United States, 444 F.2d at 680-682. *211 Because the parties did not allocate the price among the separate assets in their contract, the rule of Commissioner v. Danielson, supra, is inapplicable. [7] See Shepard v. Commissioner, 57 T.C. 600, 610-611 (1972), revd. by unpublished order 481 F.2d 1399 (3d Cir. 1973). Turning to the task of allocating the purchase price among the individual assets, we begin by determining the value of the intangible assets. This is a question of fact (see Wilmot Fleming Engineering Co. v. Commissioner, 65 T.C. 847, 861 (1976) *212 that cannot be determined on the basis of any simplistic rule or formula. In reaching our conclusion, we have studied the witnesses' testimony and the exhibits with great care. We have considered the factors that might bear on a purchaser's decision to acquire a company and on his determination of the price he is willing to pay, including the history of Norge, its earnings, its sales, its place in the white goods industry, the nature of that industry, and its likely future. While no useful purpose would be served by a detailed explication of our reasoning, the major factors bearing on our decision are discussed below. Norge's poor history of earnings is an important fact that tends to show that the Norge intangibles were worth considerably less than Borg-Warner claims. The concepts of goodwill and going-concern value are associated with the expectation of continued profits notwithstanding a change in ownership. Thus, goodwill is frequently defined as the expectation of continuing excess earning capacity and some competitive advantage or continued patronage. E.g., VGS Corp. v. Commissioner, 68 T.C. at 590; Wilmot Fleming Engineering Co. v. Commissioner, supra at 861. *213 Similarly, going-concern value is defined in terms of the ability to generate income. In VGS Corp., we said (p. 592) that the theory of going-concern value is-- that even in the absence of goodwill, excess earning capacity, and the like, the ability of a business to continue to function and generate income without interruption as a consequence of the change in ownership, is a vital part of the value of a going concern. Winn-Dixie Montgomery, Inc. v. United States, 444 F.2d 677, 685 (5th Cir. 1971); Computing & Software, Inc. v. Commissioner, 64 T.C. 223, 235 (1975). Moreover, we are mindful that the purpose of a business is, by definition, to make a profit. Cf. Godfrey v. Commissioner, 335 F.2d 82, 84 (6th Cir. 1964), affg. T.C. Memo. 1963-1; Hirsch v. Commissioner, 315 F.2d 731, 736 (9th Cir. 1963), affg. T.C. Memo. 1961-256. Accordingly, in reaching our conclusion herein, we have placed considerable weight on Norge's poor earnings history. We have not overlooked Norge's profitability from 1952 to 1962, but we think its success during this period was largely attributable to *214 the outstanding talent of Judson Sayre. The managerial ability, experience, and personal attributes of an individual are not transferable goodwill. [8]Wilmot Fleming Engineering Co. v. Commissioner, supra at 861; Estate of Gannon v. Commissioner, 21 T.C. 1073, 1081 (1954); MacDonald v. Commissioner, 3 T.C. 720, 727 (1944). We have also considered the fact that, after a period of losses following Sayre's retirement, Norge began to earn a profit again before its sale to Fedders. Further, we recognize that Norge's losses were due in part to two specific problems, namely, the Norge Villages and the Fort Smith plant. Nevertheless, the picture of Norge that emerges from the record is a company that, since World War II, was unable consistently to earn a profit except under the exceptional managerial leadership of Judson Sayre. On the other hand, the fact that Norge was not consistently profitable is not dispositive of *215 the issue. Just as high earnings alone do not prove the existence of goodwill, Wilmot Fleming Engineering Co. v. Commissioner, supra at 860-861; Carty v. Commissioner, 38 T.C. 46, 58 (1962), lack of profitability does not in and of itself prove the absence of any intangible value. [9]Buddy Schoellkopf Products, Inc. v. Commissioner, 65 T.C. 640, 645, 647-648 (1975); Computing & Software, Inc. v. Commissioner, 64 T.C. at 235; C.F. Hovey Co. v. Commissioner, 4 B.T.A. 175, 177 (1926). Concededuly, Norge had no goodwill in the sense of excess earnings capacity and Borg-Warner does not contend otherwise. Nor do we think that Norge had much going-concern value in the sense of an inherent capacity to continue generating a profit. To the contrary, its ability to earn a profit at all was tenuous. The changes that Fedders made after its acquisition of Norge in personnel, plant, product lines, and distribution support our conclusion. No doubt, as Borg-Warner *216 contends, some of these changes merely reflect differences between Borg-Warner's and Fedders' management in business policy and philosophy. The magnitude and number of changes, however, undermine this argument. If Norge had been a more profitable operation, we doubt that Fedders would have been so quick to make changes. In addition, we have been influenced by Borg-Warner's own recognition of the need to make substantial changes by either investing more capital in Norge or merging with another white goods company. The fact that the business was sold at net book value and no dollar value was ever assigned to intangibles in the parties' negotiations also tends to show the Norge intangibles had little value. See Wilmot Fleming Engineering Co. . Commissioner, 65 T.C. at 860. Notwithstanding the factors discussed above, we are convinced that the Norge name was valuable. Fedders itself took this position in materials prepared for its lenders, in public statements after the acquisition, and in statements to securities analysts. More importantly, Fedders used the Norge name extensively. [10] See Winn-Dixie Montgomery Inc. v. United States, 444 F.2d at 681; *217 Computing & Software, Inc. v. Commissioner, 64 T.C. at 235. These statements and actions, together with the extensive evidence of the importance of a brand name in the white goods industry, are compelling evidence that the Norge name had value, one aspect of which at least was to accelerate Fedders' ability to enter the field more effectively than if it had had to establish a new name from scratch. We conclude that, to the extent that the Norge Division had any goodwill or going-concern value (such as its distributorship system), it emanated from and was inextricably intertwined with the name Norge. [11]
There are, as in most cases, other factors that favor *218 the opposite conclusion. Norge's market share was small and declining and its ratings in consumer publications showed a downward trend, a factor which would tend to reduce the value of the Norge name. Further, a large portion of its sales were to companies that sold Norge products under their own labels. We think that quality and price, not brand name, would be the important considerations in such sales. We have given careful consideration to these factors and have taken them into account in determining the value of the Norge name. We turn now to the task of placing a value on the Norge name. Fedders, adhering to its position that the Norge name had no value, introduced no evidence on this aspect of the issue. Borg-Warner sought to prove the value of the Norge name through expert testimony. Glenn S. Olinger, a businessman with over 20 years of experience in the appliance industry, testified that a purchaser of a household appliance business would require a discount of 1/3 to 1/2 of the book value if he were not acquiring the brand name of the business. Because of the general nature of Mr. Olinger's testimony, it is of little assistance in valuing the Norge name. His conclusion *219 is based on his knowledge of negotiations regarding a contemplated sale of Ford's refrigerator business without the name Philco, but the evidence provides no basis for comparison of the Philco and Norge names. Moreover, Mr. Olinger had almost no knowledge of Norge's operations at the time of Fedders' acquisition. Borg-Warner also presented evidence of the cost of creating consumer awareness of a new brand name. Mr. Olinger testified that in 1968 it would cost $8 - $10 million a year for several years to acquire consumer recognition of a new name. The record does not reveal the foundation of his opinion (other than his general experience) and, therefore, his opinion is difficult to evaluate. On balance, we are unable to accord it much weight. On the other hand, the testimony of Richard Larko, an advertising executive, was based on a written study which was admitted into evidence. According to his study, an expenditure of approximately $18 million over five years would be required to establish consumer awareness of a brand name by 1968, the year in which Fedders acquired the Norge name by purchase. He projects high expenditures in the first two years ($5,400,000 in year one, *220 $3,750,000 in year two) followed by an expenditure of $3,000,000 in each of the last three years, a figure somewhat higher than the average of $2,067,000 expended each year by the top ten (see p. 27, supra). We find that Mr. Larko's study is carefully reasoned and reliable. However, in basing an argument on this study, Borg-Warner failed to take into account the fact that there is a cost involved in maintaining the favorable impact of any trade name. Thus, we think that the relevant figure is not the cost of establishing a new name, as argued by Borg-Warner, but rather is the amount by which the cost of establishing a new name exceeds the cost of maintaining an existing name. The difference between Mr. Larko's estimate of the cost of establishing a new name ( $18 million over five years) and the average expenditures for traceable advertising by the top ten companies over five years ($2,067,000 x 5 = $10,335,000) is $7,665,000. Moreover, since the Norge name had some negative attributes, Mr. Larko's figure should be further reduced to account for the expense that a purchaser would have to incur to try to improve the Norge image. Taking all these factors into account, as well *221 as the factors we considered in determining whether any value at all attached to the Norge name (see p. 50-51, supra), we conclude that the fair market value of the Norge name and any goodwill or going-concern value that emanated from the name was $4.5 million. Cf. Buddy Schoellkopf Products, Inc. v. Commissioner, 65 T.C. 640 (1975). We think it is important to note, however, that, although we have placed substantial emphasis on the estimated cost of establishing a trade name in arriving at a value for the Norge name (cf. Richard S. Miller & Sons v. United States, 210 Ct. Cl. 431, 447, 537 F.2d 446, 456 (1976)), we are not adopting any firm principle regarding the use of such analysis in other cases. Each situation will have its own variants and we have simply adopted this approach as providing the most probative evidence based upon the particular facts and circumstances revealed by the record herein. Having determined that the fair market value of the Norge intangibles was $4.5 million, we turn now to the question of how to allocate the purchase price among the Norge assets. The rule is simply stated: where a lump sum is paid for a going *222 business, after valuing cash and cash equivalents at their face values, the balance of the purchase price is allocated among the remaining individual assets according to their relative fair market values. Victor Meat Co. v. Commissioner, 52 T.C. 929, 931 (1969); F. & D. Rentals, Inc. v. Commissioner, 44 T.C. at 346. Fedders argues that if the intangibles have any value, the proper adjustment to account for such value is to the cost basis of the fixed assets and not to the current assets. It offered no independent evidence of the fair market value of either the fixed assets or the current assets. As support for its position, Fedders relies on the testimony of its expert, Donald Kehoe, a certified public accountant, and on case law, particularly VGS Corp. v. Commissioner, 68 T.C. 563 (1977), and Northern Natural Gas Co. v. United States, 470 F.2d 1107 (8th Cir. 1973). We think neither the expert testimony nor the case law requires the result that Fedders seeks. Mr. Kehoe cited Accounting Principles Board Opinion No. 16 (August, 1970) as the authority for his opinion. We have read this opinion and find it is *223 silent on the precise issue before us. Yet, even if this were the rule for purposes of financial accounting, we would not be bound by it.Thor Power Tool Co. v. Commissioner, 439 U.S.     (Jan. 1979). With respect to the cases cited by Fedders, it is true that in those cases, the court stated that the amount of the lump-sum purchase price attributable to going-concern value must be excluded from the values the taxpayer assigned to depreciable assets. VGS Corp. v. Commissioner, supra at 592; Northern Natural Gas Co. v. United States, supra at 1110. However, Fedders overlooks the fact that the courts' statements were made in the context of the Commissioner's assertion that the fixed assets were overvalued, thus reflecting enhancement by going-concern value, and that the Court agreed with this assertion. The value of the current assets was not at issue. Fedders has not argued that the book value of the fixed assets is inflated. To the contrary, Fedders argues that the book value is a price negotiated at arm's length and, thus, equal to fair market value. Moreover, because book values represent cost less depreciation, we are inclined *224 to doubt that they reflect enhancement by the value of intangibles. Although Fedders does not state its position in terms of cash equivalency, its argument is essentially that current assets should be treated as cash equivalents. Where the facts warranted such treatment, prepaid insurance and other prepaid expenses have been treated as cash equivalents, see Victor Meat Co. v. Commissioner, supra at 933, and accounts receivable guaranteed by the seller have been treated as cash equivalents, Bixby v. Commissioner, 58 T.C. 757, 786 (1972). But, as a general rule, current assets are not cash equivalents. See Victor Meat Co. v. Commissioner, supra; Boise Cascade Corp. v. United States, 288 F. Supp. 770 (S.D. Idaho 1968). Borg-Warner discerns three separate intangible assets in Norge: (1) going-concern value; (2) brand name; and (3) distribution system. It then reduces the book value of the tangible assets that are enhanced by the separate intangible assets by the amount attributable to the intangibles, although as our subsequent discussion will reveal, Borg-Warner appears to recognize that these elements *225 are not totally unrelated but tend to coalesce under the umbrella of the Norge name - a point of view which is consistent with our own previously articulated position. For the reasons stated below, we think Borg-Warner's approach is without merit. Borg-Warner approaches the allocation of going-concern value in a manner similar to that of Fedders. Citing cases which state that going-concern must be valued separately from depreciable assets and relying on Mr. Olinger's testimony that an appliance company without a brand name would sell at a discount of 1/3 to 1/2, Borg-Warner bootstraps itself to the conclusion that 1/3 to 1/2 of the book value of Norge's land, plant, and equipment represents going-concern value. Like Fedders, however, Borg-Warner has presented no evidence as to the fair market value of the fixed assets but, rather, assumes, without proving, that the book value of the fixed assets reflects enhancement by going-concern value. Another defect in Borg-Warner's approach is that it relies on Mr. Olinger's testimony, which dealt with the value of a brand name, for its argument as to going-concern value, which it distinguishes from brand name. Borg-Warner contends the *226 inventory and accounts receivable are the assets that are most affected by the vale of the brand name and distributorship system. It then argues that the fair market value of the accounts receivable and inventory is the amount for which they could be sold without the Norge name and distributorship system. Its experts testified that the inventory could only be sold under these conditions at a discount of 1/3 to 1/2 off book value and that the accounts receivable could only be sold at a discount of 15 percent off book value. Borg-Warner attributes the difference between this amount and book value to the intangible assets. We think that Borg-Warner has applied the wrong standard of valuation. The basic legal definition of fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts. See 10 Mertens, Law of Federal Income Taxation, sec. 59.01 (1976 rev.). When a business is sold as a package, its assets must be valued in that posture. Kraft Foods Co. v. Commissioner, 21 T.C. 513, 585 (1954), *227 revd. on another issue 232 F.2d 118 (2d Cir. 1956). In the case of inventory, this means it must be valued on the theory that it may be sold to a hypothetical willing buyer having facilities equal to that of the seller for distributing it at retail. Knapp King-Size Corp. v. United States, 208 Ct. Cl. 533, 551-552, 527 F.2d 1392, 1401-1402 (1975). Borg-Warner relies heavily on the testimony of witnesses as to the discount that would be necessary to sell the inventory without a brand name, i.e. they assumed a forced sale of the inventory on a liquidation basis, separate from the business of which it was a part and to a buyer who did not have an established market in which to sell it. We think such testimony is of minimal relevance herein because it ignores, as does Borg-Warner's argument based thereon, the economic reality of the sale to Fedders.Borg-Warner rejected the option of liquidating Norge because it would have incurred substantial losses on the sale of its inventory and accounts receivable. Instead, it chose to sell the Norge Division as a package and we think it can be inferred that, by choosing this option, it avoided the large losses that *228 it would have suffered on liquidation. Because the valuation it seeks herein would result in large losses, it appears that such valuation is closer to the liquidation values than to the amount a buyer would pay for inventory and receivables purchased as part of an entire business. That Borg-Warner's valuation does not reflect economic reality is further evidenced by the fact that it would result in large profits for Fedders and large losses for Borg-Warner. We cannot believe that Borg-Warner would sell its inventory and receivables to Fedders at such a discount if Fedders could obtain the same price for them that Borg-Warner could have obtained through normal market distribution. We conclude that Borg-Warner takes much too narrow a view of the proper method of valuing the inventory and receivables sold to Fedders. Knapp King-Size Corp. v. United States, supra.
United States v. Cornish, 348 F.2d 175 (9th Cir. 1965), upon which Borg-Warner relies for the proposition that the inventory must be valued at the price it would bring if sold without regard to the Norge name, is inapposite. In Cornish, the court refused to accept the taxpayer's *229 valuation of timber on the basis of a "work back" or conversion formula. The formula began with estimated sales realization and subtracted expenses and anticipated profit. The court believed that this formula improperly took into account the prospect that the business would get more and better timber out of a given tree than most other sawmills, a prospect that was attributable to the sellers' unique skills and abilities. In reaching its decision, the court considered separately the past exercise and the future exercise of the sellers' skills and abilities. With respect to the part exercise of the sellers' skills and abilities, the court concluded that they were an inseparable part of the sawmills and were properly reflected in the valuation of the sawmills. For this reason, the court stated that the formula had the effect of valuing this element twice. With respect to the prospect that the sellers would exercise their skills and abilities in the future, the court held that this was an intangible asset, but that it had not been purchased by the buyers because the sellers were not contractually committed to devote their skills to the business. Therefore the court concluded that *230 it was improper to include these skills and abilities in the valuation of the timber. We fail to see the relevance of Cornish to the instant case. In Jack Daniel Distillery v. United States, 180 Ct. Cl. 308, 379 F.2d 569 (1967), the court held that it was proper, for purposes of section 334(b)(2), to value unbottled Jack Daniel whiskey on the assumption that the purchaser was acquiring the right to use the Jack Daniel label. The court rejected the Commissioner's contention that the Jack Daniel name was an intangible asset that had to be separately valued because the court found that Jack Daniel acquired uniqueness during the distillation and leaching process prior to being placed in barrels to age and because, as a matter of commercial practice, the whiskey would not be sold at all without the right to use the Jack Daniel name. See Heaven Hill Distilleries, Inc. v. United States, 201 Ct. Cl. 423, 432-434, 476 F.2d 1327, 1333 (1973). Borg-Warner argues at length that Norge appliances are not unique like Jack Daniel whiskey and that Jack Daniel Distillery v. United States, supra, is therefore not controlling. While we *231 tend to agree with Borg-Warner's distinction, we do not think that it supports the opposite inference which Borg-Warner seeks to draw from it to support its valuation of the Norge inventory at 2/3 of book value. As we have already pointed out, such a valuation applies the wrong standard because it is based on the assumption that the inventory is not sold as part of a package but rather to a buyer who has no established market in which to sell it. See pp. 59-60, supra. Moreover we note two further factors which support our conclusion that Jack Daniel Distillery is inapplicable: (1) the issue before the court, in that case, was a narrow one, i.e. limited to the valuation of existing unbottled whiskey and did not involve, as does the case before us, the valuation of a business sold as a package and the auxiliary right to use a trade name on goods to be manufactured and sold in the future and (2) there was no issue as to any inventory which might be available for sale under a private label as in the case herein, it being clear that the unbottled whiskey could, because of its uniqueness, only be marketed under the Jack Daniel name. Cf. Bourjois, Inc. v. McGowan, 85 F.2d 510 (2d Cir. 1936). *232 Having rejected Fedders' argument that the book values of the assets represent prices negotiated at arm's length for individual assets and having rejected Borg-Warner's evidence as irrelevant under the applicable standard for measuring fair market value, we are left with the task of allocating the purchase price among the assets on the basis of a rather barren record. Respondent's position as a stakeholder does not shift the burden of proof. See Wilmot Fleming Engineering Co. v. Commissioner, 65 T.C. at 860; Freeport Transport, Inc. v. Commissioner, 63 T.C. 107, 116-117 (1974) (Dawson, J., concurring), and cases cited thereat. Had we not found a value for intangibles, we think we technically would have been justified in sustaining each of respondent's determinations on the ground that both petitioners have failed to carry their burden of proof. However, we have found a value of $4.5 million for the intangibles of the Norge Division, i.e., the Norge name, and in any event we think such a disposition inappropriate for cases such as this where both parties are before us. See Freeport Transport, Inc. v. Commissioner, supra at 115. *233 Accordingly, we proceed to allocate the purchase price as best we can on the basis of the record herein. After careful consideration of the record, we conclude that the book values of the Norge assets are the best evidence of their fair market value. [12] We are well aware that book value does not necessarily bear any relationship to fair market value, but book value is some evidence of fair market value and has been resorted to in the absence of other evidence. See Bos Lines, Inc. v. Commissioner, 354 F.2d 830, 839 (8th Cir. 1965), affg. T.C. Memo. 1965-71; Blum v. Commissioner, 5 T.C. 702, 709 (1945). *234 There is strong evidence that the parties thought that, in this case, book values did bear considerable relationship to fair market values: the fact that Norge was sold for its net book value, the fact that Fedders has steadfastly maintained that the book values represent negotiated fair market values, and the fact that Borg-Warner used book values as a starting point for its discounts (which we have rejected) and did not introduce any evidence of fair market value independent of book value. Moreover, under the terms of the sales contract, the book value of the inventory was to be determined at the lower of cost or market value. It is, by definition, equal to or less than Borg-Warner's investment and we think it is not unreasonable to infer that a buyer would be willing to pay this amount for the inventory as part of a going-concern. Similarly, we think that it is not unreasonable to infer that a buyer would be willing to pay book value, that is, face value less a reserve for bad debts, for accounts receivable acquired as part of a going business. At this point we are constrained to note that the issue involved herein has many of the qualities found in the usual valuation case. *235 It therefore lacks the talismanic precision with which counsel for each of the parties has sought to imbue it and was clearly more susceptible of disposition by way of negotiation and settlement rather than being subjected to the judicial process with its concomitant inordinate expenditure of time, effort, and money by all concerned. See Messing v. Commissioner, 48 T.C. 502, 512 (1967). Indeed, the Court repeatedly sought to persuade the parties to pursue the settlement route, all to no avail. Accordingly, we have discharged the responsibility thrust upon us, carefully avoiding the blandishment of the parties to dissect each element with a surgical knife. Rather, we have carefully considered each of the elements discussed by the parties in the context of the entire record before us and weighed all of the facts and circumstances revealed herein. Fedders argues that, if it did acquire any intangible assets of value, it abandoned those assets within the first year after the acquisition and is entitled to an abandonment loss under section 165(a). In making our determination as to the value of the Norge Division's intangible assets, we considered the substantial *236 changes that Fedders made following the acquisition as evidence that Norge had little going-concern value as such and concluded that any intangible value that was transferred emanated from and was inextricably intertwined with the Norge name. See p. 49, supra. It is clear that Fedders did not abandon the Norge name. Accordingly, Fedders is not entitled to an abandonment loss. Borg-Warner claims entitlement to an ordinary loss under section 165(g)(3) for its stock in Warren-Connolly Company, a wholly owned subsidiary whose sole activity was distribution of the Norge Division's products. Borg-Warner had a tax basis of $2,258,301 in the stock and valued it at $1,503,776 in its original allocation of the sales proceeds from Norge. In his deficiency notice to Borg-Warner, respondent used Fedders' allocation, which had allocated no part of the purchase price to Warren-Connolly stock. Borg-Warner accepted respondent's valuation of the Warren-Connolly stock and attempts to capitalize on it by claiming a worthless stock deduction. We think that the record does not support Borg-Warner's contention that its Warren-Connolly stock was worthless on the date of sale. The balance sheet *237 that Peat, Marwick, Mitchell & Co. prepared, which was the subject of price negotiations and was, with certain adjustments, the basis upon which Fedders allocated the purchase price, was a combined balance sheet which reflected the assets of both Norge and Warren-Connolly.Thus, the fact that Fedders allocated no part of the purchase price to Warren-Connolly stock does not mean that it allocated no part to Warren-Connolly's assets. On the record herein, we have held that the book values of the separate assets are the best evidence of their fair market values and, as far as we can determine from the record, some of those assets belonged to Warren-Connolly. Thus, we conclude that Borg-Warner has failed to sustain its burden of proof that its stock in Warren-Connolly was worthless in 1968 and it is therefore not entitled to a worthless stock deduction. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue, unless otherwise indicated. ↩
2. In their petition, Fedders and its subsidiary, Fedders Financial Corporation, claim entitlement to deductions for accrued state taxes in excess of the amount allowed by respondent and Fedders claims entitlement to a deduction for repair expenses that respondent determined must be capitalized. Fedders introduced no evidence at trial and made no arguments on brief with respect to these issues. Further, Fedders stated on brief that it would not "add to the Court's burden by making a point as to * * * other issues." Accordingly, we conclude that Fedders has conceded these issues. In any event, we would hold for respondent on these issues on the ground that Fedders has failed to carry its burden of proof. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Fedders also states on brief that there are other issues that are affected by our determination of the proper allocation of the purchase price and suggests that these can be resolved in connection with the Rule 155 computation. We admonish Fedders that proceedings under Rule 155 are strictly limited to consideration of the correct computation of the deficiency and no further argument will be heard on issues decided herein or on new issues. Bankers' PocahontasCoal Co. v. Burnet,287 U.S. 308 (1932); Estate of Stein v. Commissioner,40 T.C. 275, 280 (1963); Rule 155(c), Tax Court Rules of Practice and Procedure.↩
1. Corporate overhead and debt, which was absorbed by Borg-Warner, has not been taken into account in computing the above figures. The above figures also reflect intercompany profits on sales to Borg-Warner International. ↩
2. Estimated at 52.8%.↩
3. The record does not indicate how much Borg-Warner spent for retooling in these years. Such amounts are included in the amounts shown for Fedders under "Jigs and Dies." This fact must be considered when comparing figures.↩
1. This figure includes construction of the Fort Sminth refrigerator plant.↩
4. In making this allocation, Borg-Warner valued the sales proceeds at $55,790,307. Subsequently, Borg-Warner and respondent agreed that the total sales proceeds equals $56,550,507.↩
5. In determining the deficiency against Fedders, respondent determined that the total consideration paid was $58,169,043, consisting of the net book value of $45,213,255 plus liabilities of $12,955,788. See R.M. Smith, Inc. v. Commissioner, 69 T.C. 317, 321-322 (1977), affd. 591 F.2d 248 (3d Cir. 1979). We are unable to independently determine from the record the amount of liabilities assumed. However, since Borg-Warner requested as a finding of fact that the liabilities assumed were in the amount of $12,955,788 (the amount used by respondent in the deficiency notice to Fedders) and neither respondent nor Fedders objected to this proposed finding, we assume that it is correct. Fedders' argument that respondent used Borg-Warner's tax basis in making the allocation in its deficiency notice to Fedders is not supported by the facts. Borg-Warner's tax basis in the Norge assets was $62,325,364.↩
6. For a similar argument, see Concord Control, Inc. v. Commissioner,T.C. Memo., 1976-301↩.
7. Even if the parties had made an allocation, we think that the Danielson rule would in any event be inapplicable because both parties are before the Court. Freeport Transport, Inc. v. Commissioner, 63 T.C. 107, 115-116 (1974). We do not think that the applicability of Danielson depends on whether the respondent takes the role of an active or passive stakeholder, as Fedders contends. Rather, we think the critical point is whether respondent chooses to rely on the parties' agreement. See Freeport Transport, Inc. v. Commissioner,supra at 118 (Tannenwald, J.,↩ concurring).
8. However, the contractual right to an individual's services, if sold as part of a going-concern, may be an intangible asset. See United States v. Cornish, 348 F.2d 175, 182↩ (9th Cir. 1965).
9. See Pensacola Greyhound Racing, Inc. v. Commissioner, T.C. Memo. 1973-225↩, affd. in unpublished opinion (5th Cir. 1974).
10. See R. M. Smith, Inc. v. Commissioner, T.C. Memo. 1977-23↩. 11. We find it unnecessary to draw fine distinctions between goodwill, going-concern value, tradename, and other intangibles because Fedders makes no claim that it acquired any valuable intangible assets that are amortizable. Compare Houston Chronicle Publishing Co. v. United States, 481 F.2d 1240, 1247 (5th Cir. 1973); Union Bankers Insurance Co. v. Commissioner, 64 T.C. 807, 831-832↩ (1975).
12. We note that there is evidence of the replacement value of the Norge plants in the record. However, neither party has relied on it as evidence of fair market value. Because Borg-Warner and Fedders never agreed on the book value of each individual asset but rather compromised and agreed to a figure of $45,213,255 for the final purchase price, the record does not contain a balance sheet that reflects the final purchase price or its breakdown. Therefore, the parties are directed to use the book values shown on the balance sheet prepared by Peat, Marwick, Mitchell & Co. (the PMM balance sheet) (see p. 21, supra) as a starting point and to make the following adjustments to reflect the final terms of the sale. Since the liabilities assumed by Fedders amounted to $12,955,788 (see footnote 5, supra) and the parties agreed that $45,213,255 was the net book value of the Norge Division for purposes of determining the selling price, the aggregate book value of the assets is determined to be $58,169,043 ($45,213,255 plus $12,955,788). The aggregate book value of the assets shown on the PMM balance sheet is $61,913,788. The value of each asset shown on the PMM balance sheet is to be reduced by an amount determined by the following formula: X= A/B X C In the formula, X equals the amount to be subtracted from a given asset (the "unknown"), A equals the value of a given asset as shown on the PMM balance sheet, B equals $61,913,788, the aggregate value of the assets as shown on the PMM balance sheet and C equals $3,744,745, the difference between the aggregate value of $61,913,788 shown in the PMM balance sheet and the aggregate value of $58,169,043 which reflects the final purchase price. After determining the book value of each asset in accordance with the above directions, the purchase price is then to be allocated among the individual assets using the following formula: Y=D/E X F In the formula, Y is the portion of the purchase price to be allocated to a given asset (the "unknown"), D is the fair market value of a given asset (for "goodwill" it is $4.5 million and for the other assets it is the book value adjusted in accordance with the directions above), E is the total fair market value of all assets ($58,169,043 plus $4,500,000 equals $62,669,043), and F is the total purchase price. (Borg-Warner and the respondent agreed that the total sales proceeds equals $56,550,507. Fedders was not a party to this agreement but as far as the record and briefs indicate, Fedders does not disagree with respondent's determination that, as to it, the purchase price paid by Fedders is $58,169,043, the sum of $45,213,255 and $12,955,788, the liabilities assumed by Fedders. See footnotes, 4, 5, supra↩).